Guadalupe **GUAJARDO, Jr., et al., Plaintiffs,**

v.

**W. J. ESTELLE, Jr., Director, Texas Department of ·Corrections, et al., Defendants.**

**Lawrence C. POPE et al., Plaintiffs,**

v.

**H. H. COFFIELD et al., Defendants.**

**Civ. A. Nos. 71–H–570, 72–H–1076.**

United States District Court, S. D. Texas, Houston Division.

April 22, 1977.

On Entitlement to Attorneys' Fees May 17, 1977. Fixing Attorneys' Fees June 7, 1977.

---

Richard J. Trabulsi, Jr., Sheryl B. Johnson, Baker & Botts, Ann Lentz, Vinson & Elkins, Houston, Tex., for plaintiffs.

Gilbert J. Pena, Asst. Atty. Gen., Austin, Tex., for defendants.

*Memorandum*

### SINGLETON, District Judge.

For six years now this court has grappled with the constitutional problems presented by the mail rules and regulations of the Texas Department of Corrections. In 1971, plaintiff Guadalupe Guajardo, an inmate at the Texas Department of Corrections, filed suit under 42 U.S.C. § 1983 on behalf of himself and other TDC inmates to challenge the constitutionality of the TDC correspondence rules and practices then in effect. Following trial of the case in 1972, the court found a substantial number of the rules invalid on first, sixth, and fourteenth amendment grounds and ordered injunctive relief. *Guajardo v. McAdams*, 349 F.Supp. 211 (S.D.Tex.1972).[1] On appeal, the Fifth Circuit reversed and remanded, holding that the TDC Rules and Regulations applied statewide and could be enjoined only by a three-judge court. *Sands v. Wainwright*, 491 F.2d 417 (5th Cir. 1973), *cert. denied*, 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974).

Plaintiff Guajardo subsequently amended his complaint with leave of court to withdraw his prayer for injunctive relief and now seeks declaratory relief only. Defendants urge nonetheless that this case requires the convening of a three-judge court. According to defendants, the issuance of a declaratory judgment in this case would have the same effect as an injunction. Their position is not well-founded. The rule is well established that a three-judge court need not be convened when a declaratory judgment is the only relief sought. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 152–55, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); *Riddell v. National Democratic Party*, 508 F.2d 770, 775 (5th Cir. 1975). The fact that Guajardo withdrew a prayer for injunctive relief from his

complaint does not affect the workings of that rule. *Steffel v. Thompson*, 415 U.S. 452, 457 & n.7, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Kane v. McDaniel*, 407 F.Supp. 1239, 1240–41 (W.D.Ky.1975). A single-judge district court clearly has jurisdiction to grant the declaratory relief sought in this case.

The correspondence rules and practices presently under the court's consideration differ substantially from those challenged at the original *Guajardo* trial. After the order of remand from the Fifth Circuit, the named plaintiff and the defendants began lengthy settlement negotiations culminating in the submission of a proposed settlement agreement preliminarily approved by the court on June 9, 1976. Although implementation of a considerably more liberal set of rules appeared imminent, the plaintiff balked. Both a recent Fifth Circuit decision, *Taylor v. Sterrett*, 532 F.2d 462 (5th Cir. 1976), and the comments and objections of the class led the named plaintiff to conclude that the proposed rules did not comport fully with constitutional requirements. Subsequent negotiations between the parties were not wholly successful, and plaintiff moved to vacate the settlement agreement in part. In September, the court severed out for trial those issues still in dispute and conditionally approved the rules as further modified. At that time the court also appointed five additional class representatives,[2] reaffirmed the propriety of certification of the class, and consolidated a related case, *Pope v. Coffield*, Civil Action No. 72–H–1076, with *Guajardo*. A second trial to the court, this time focused on the constitutionality of the rules as conditionally approved, took place in December.

Despite the significant changes worked by the conditionally approved rules, the parties are no closer to agreement on many major points than they were at the time of

---

1. As a result of the original trial in this court, the TDC undertook a major and much needed revision of its correspondence rules and regulations. The product of that revision, with some additional modification, is contained in the current set of rules, adopted by the Texas Board of Corrections in 1975.

2. Plaintiff Guajardo was an inmate at the TDC at the time he filed this action, but was released on parole in 1976. The added class representatives, James E. Baker, Ronald Kent Franks, Thomas E. Hill, Allen L. Lamar, and Lawrence C. Pope are presently confined in the TDC.

the original trial. Among the rules and practices still at issue are those providing for inspection of mail from inmates to attorneys, censorship of mail to and from the media, maintenance of correspondence lists, censorship of general correspondence, and censorship of publications.

In attempting once again to resolve the difficult constitutional questions this case presents, the court has the added guidance of recent Supreme Court and Fifth Circuit decisions concerning restrictions on prisoner correspondence. In *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Supreme Court considered the constitutionality of prisoner mail censorship regulations of the California Department of Corrections. The Court stated that the undeniable interests which the government has in prison security, order, and rehabilitation supply no automatic license to censor inmate correspondence. Rather, any evaluation of first amendment challenges to prison correspondence regulations and practices must accommodate both governmental and individual interests:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

416 U.S. at 413, 94 S.Ct. at 1811. Applying that standard, the Court held that the challenged regulations were overbroad and restricted first amendment rights impermissibly. The Court found it unnecessary to define the extent to which prisoners' first amendment rights survive incarceration, basing its decision instead on the rights of the prisoners' correspondents.

A second Supreme Court case, *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), addressed, among other issues, the propriety of opening mail to inmates from attorneys. Without describing precisely the limits of the first, sixth, and fourteenth amendment rights asserted by the prisoners, the Court in *Wolff* upheld a narrow regulation permitting prison officials to open and inspect attorney mail for contraband in the presence of the inmate.

In *Taylor v. Sterrett, supra*, the Fifth Circuit sustained a broad-based challenge to rules and practices of the Dallas County Jail affecting outgoing and incoming prisoner correspondence with attorneys, courts, governmental officials, and the media. Inmates of the Dallas County Jail objected to the opening, inspecting, and reading of that correspondence on the basis of their first amendment rights, their fourteenth amendment right to access to the courts, and their sixth amendment right to effective assistance of counsel. Before beginning its explication of the constitutional standards applicable to inmate communication with each type of correspondent, the court discussed the import of the implicit sanction given reading and censorship of inmate mail by the *Procunier v. Martinez* majority. The Fifth Circuit explained that *Procunier* did not preclude a prohibition on reading inmate correspondence under the special circumstances presented in *Taylor*. The court emphasized that the mail procedures before it affected limited, special groups of correspondents, not the general public, noting that:

> The nature of the former correspondents brings into play prisoner interests in access to the courts and effective assistance of counsel. When First Amendment interests are intermeshed with other fundamental prisoner interests, courts are aware that special protections may be necessary.

532 F.2d at 466 (citation omitted).

Turning to an assessment of the interests involved in prisoner correspondence with courts, attorneys, and probation and parole

officers, Judge Wisdom, for the panel, found no governmental interest to justify either reading or opening outgoing mail. The government's interest in maintaining jail security did support the opening of incoming mail from those sources, but only for an inspection for contraband, and only in the presence of the inmate. The court found the primary underpinning for that conclusion in the fourteenth amendment right of access to the courts.

Evaluation of jail procedures for handling prisoner correspondence with governmental agencies and the press required a different constitutional framework. Answering a question left open by the Supreme Court, the panel held that the *Procunier v. Martinez* standard governs adjudication of the first amendment rights of prisoners themselves. Employing that test, the court determined that the Dallas County correspondence practices infringed unnecessarily upon prisoners' first amendment rights to free expression and to petition for redress of grievances. The court concluded that procedures similar to those applicable to inmate-attorney mail would adequately protect governmental interests in security, order, and discipline. The court therefore directed that outgoing mail to governmental agencies and the press no longer be opened or read and that incoming mail from those sources be opened only for the purpose of locating contraband, and only in the presence of the inmate.

Guided by the teachings of these cases, this court has undertaken consideration of the constitutional attacks launched against the rules and regulations conditionally approved for the Texas Department of Corrections. In reexamining the conclusions drawn in *Guajardo v. McAdams*, the court finds that certain holdings from that opinion withstand the perspective of hindsight. Other holdings, however, require some revision, and additional questions which have surfaced since the time of the original opinion require resolution.

## TDC ORGANIZATION AND SECURITY PRACTICES

The Texas Department of Corrections reports that it has the largest state prison population in the country, housing somewhat in excess of 20,600 inmates. The inmates are divided among some fifteen units, all of which, except Jester, the Pre-Release Center, are operated as maximum security units. These units are scattered for the most part through rural East Texas. All inmate correspondence is channeled through unit mail rooms staffed by some 57 mail room officers.

Nearly every inmate at some time works in the TDC's comprehensive agricultural program. The TDC has over 100,000 acres devoted to farming and to raising livestock and poultry. This agricultural acreage is criss-crossed by state highways and public roads. As many as 4,000 inmates on a given day are outside the security perimeters of the various units as agricultural workers. The TDC maintains tight security over these inmates. Inmates have an assigned spot in line within a squad and must maintain that position. Armed guards on horseback directly survey their work and bloodhounds are kept available.

Other TDC inmates receive jobs working construction projects, both inside and outside security perimeters. Outside construction squads also work under the supervision of armed guards. The TDC usually provides guard towers and fences, particularly on major projects.

An additional 2,000 inmates a day work outside the security perimeter without direct supervision. These inmates, who have earned State Approved Trusty Class I or Class II status, are considered sufficiently rehabilitated and trustworthy to work, for example, as domestics for TDC officials.

Of the 20,000 TDC inmates, approximately 6,000 work outside the security perimeter on an ordinary day. In order to preserve prison security and to prevent introduction of contraband, each of these workers undergoes a "strip search" upon returning within the security perimeter. Inmates are required to strip off their clothes, to submit to a skin search, to shower, and to put on new clothes before rejoining the unit popu-

lation. These security measures have proven effective. Statistics indicate that the TDC is one of the most secure institutions in the country.[3]

### SPECIAL, ATTORNEY, AND MEDIA CORRESPONDENCE

The parties are in substantial agreement on the standards to apply to "special" correspondence, which under the conditionally approved rules includes mail to and from courts and governmental agencies. Rule 3.9.2.1 provides that inmates may write and receive sealed and uninspected correspondence to and from special correspondents. Rule 3.9.2.2 permits inspection of incoming correspondence for contraband in the presence of the inmate upon a showing of probable cause. These rules clearly comport with constitutional requirements.

 There is considerably less agreement between the parties on the standards to apply to attorney and media correspondence. Under the conditionally approved rules, the TDC may inspect both outgoing and incoming attorney mail for contraband and for assurance that the correspondent is a licensed attorney or bona fide legal aid society. Inspection is in the inmate's presence if he so requests. Rules 3.9.3.1, 3.9.3.2. The rules treat media correspondence in the same manner as general correspondence. While inmates are allowed to write and receive letters to and from members of the press, those letters are freely opened and read by the TDC and are subject to rejection under the standards governing general correspondence. Rule 3.9.4.1.

These rules obviously fall short of the protections given attorney and media correspondence both in *Taylor v. Sterrett* and in the original *Guajardo* opinion. Defendants urge, nevertheless, that the *Taylor* standards should not control. The thrust of their argument is that the security and discipline problems faced by the TDC are substantially greater than those faced by Dallas County Jail administrators. Defend-

ants point out first that the TDC population is over 20,000, while the Dallas County Jail houses only in the neighborhood of 1,650 prisoners. They argue that the different nature of the prisoners in the two institutions justifies more stringent security measures within the TDC. The convicted felons serving time at the TDC pose more of a security threat, defendants maintain, than the misdemeanants and accuseds who make up the bulk of the Dallas County Jail population. Finally, they distinguish *Taylor* on the basis of the increased danger to prison security and discipline. presented by the large number of TDC inmates who work outside security perimeters. In defendants' view, the interference with attorney and media correspondence allowed by the proposed rules is an essential safeguard against escape and introduction of contraband.

The court finds the distinctions drawn between the TDC and the Dallas County Jail unpersuasive. The overall difference in size between the two institutions provides no justification for imposing more restrictive rules upon TDC inmates. The TDC operates on a unit basis. The average inmate count of those units is approximately 1200, fewer inmates than are held in the Dallas County Jail. Nor is the difference in types of offenders confined in the two institutions constitutionally significant. The TDC has not shown that convicted felons inherently create a greater threat to security, order, and rehabilitation than inmates in a county jail. The defendants' final distinction of *Taylor* has more substance. The constant flow of inmates in and out of the security perimeters of the TDC does increase the precautions necessary to preserve prison order and security. But, the TDC has not supplied the court with any evidence that either attorney or media correspondence is more susceptible of abuse than "special" correspondence, which the TDC neither reads nor inspects. This court therefore concludes that the burden on first and fourteenth amendment rights imposed

---

**3.** See Law Enforcement Assistance Administration, U.S. Department of Justice, National Prisoners Statistics Bulletin, May 1975.

by the attorney and media correspondence rules is greater than warranted by any substantial governmental interest. Any TDC rules governing such correspondence must comply with the standards established in *Taylor* and *Guajardo v. McAdams.*

■ Where attorney correspondence is concerned, those standards require that mail be sent and delivered unread. Outgoing correspondence from inmates to attorneys must be sent sealed and uninspected. The prisoners' right of access to the courts mandates no less. The greater risks posed by incoming attorney correspondence justify the TDC in opening and inspecting that mail for contraband. The court finds no legitimate basis, however, for the requirement that inmates specially request that inspection of incoming attorney mail take place only in their presence. While that requirement arguably lessens a minor administrative burden, it also forces inmates to bring themselves to the attention of TDC officials in order to assure themselves of the confidentiality of their correspondence. This infringement upon the exercise of first and fourteenth amendment rights is unnecessary to the furtherance of any legitimate governmental interest.

■ The court is also in agreement with plaintiffs on the remaining point raised with respect to attorney correspondence. The TDC requires inmates to leave mail from attorneys in writ rooms or with TDC agents. The resulting threat to the confidentiality of that correspondence is undeniable. The court perceives no substantial governmental purpose served by denying inmates the right to keep attorney correspondence in their cells and declares the

practice an unjustified restriction of the prisoners' constitutional rights.[4]

■ Turning to media correspondence, the court finds insufficient evidence of any risk to prison security, order, or rehabilitation to support the censorship allowed under the proposed rules. Outgoing media mail must therefore be sent sealed and uninspected. Allowing the TDC a reasonable time, when necessary, to verify that the addressee reflected on the face of an envelope is actually a member of the editorial or reporting staff of a media organization will adequately protect all legitimate interests the TDC has in outgoing correspondence to the media. Inspection of mail from media representatives for contraband only in the presence of the inmate similarly will protect the TDC interest in incoming mail.[5]

## GENERAL CORRESPONDENCE

The court's next task is to determine to what extent the TDC may limit and censor inmate correspondence with the general public without impermissibly restraining first amendment liberties. Section 3.9.1 of the conditionally approved rules details the restrictions on general correspondence. The TDC maintains a correspondence and visiting list with a ten-person limit for each inmate.[6] Inmates may write up to forty letters a week of "reasonable length" to the individuals on their lists. Rule 3.9.1.1. Prior TDC approval of general correspondents is required. Rule 3.9.1.2. Additions to or deletions from correspondence lists are permitted only every fifteen days. Rule 3.9.1.4. The rules authorize TDC mail room officers to read both incoming and outgoing

---

4. The court recognizes that the TDC has a legitimate interest in controlling the amount of printed material kept in cells. *Guajardo v. McAdams, supra,* at 214. Defendants have not shown, however, that attorney mail is received in such bulk as to create a safety hazard if stored in cells.

5. If TDC officials have reason to believe that a particular prisoner, attorney, government official, or media representative is using confidential mail to violate the law or threaten security, they are not without a remedy. Upon a showing of probable cause they may obtain a search

warrant to open and read the mail of the individual in question. *Taylor v. Sterrett, supra* at 475; *Palmigiano v. Travisono,* 317 F.Supp. 776 (D.R.I.1970).

6. The ten-person limit is not unqualified. The rule permits inmates to include close family members and a religious leader of their choice on their list, whatever their number. Special, attorney, and media correspondents are not counted against the total at all.

general correspondence and to reject any mail found objectionable under the criteria set out in Rule 3.9.1.9.[7] It is the plaintiffs' position that both the list and the censorship aspects of this scheme are constitutionally infirm.

■ Applying the standards of *Procunier* and *Taylor*, the court finds that the correspondence list requirement in the proposed rules unnecessarily burdens first amendment rights. The evidence in the case shows that disapproval of prospective correspondents is often arbitrary and unrelated to any legitimate interest in security, order, or rehabilitation. The TDC rejects certain classes of correspondents—prison reform organizations, "left wing" groups, married women, former inmates, inmates in other units or institutions, known homosexuals—almost automatically.[8] Yet, in the great bulk of cases, the TDC conducts no investigation into the effect a proposed correspondent might have on prison security or inmate rehabilitation. The court finds that the TDC has failed to demonstrate that prior approval of general correspondents is essential to the protection of its interests.

■ The number limitation in the rules similarly places an unnecessary restriction on the first amendment rights of inmates and their correspondents. Although the rules do give inmates the right to request a greater number of correspondents then ten, the process involved burdens both inmate and administration and invites arbitrariness

on the part of the TDC. More importantly, the evidence shows that a limit on the number of inmate correspondents prevents sending and receipt of letters which could have no possible effect upon prison security or order. The effect upon rehabilitation can only be negative. If inmate freedom to correspond with outsiders advances the goal of rehabilitation, as the TDC acknowledges, refusal to allow correspondence solely because a list is full certainly retards progress towards that goal. Finally, defendants offer no reason to support a limit on the number and length of letters other than administrative convenience. The court finds that reason insufficient to justify the resulting impairment of first amendment rights.

■ A declaration that the prior approval and correspondence list portions of the rules are unconstitutional does not mean that inmates should have wholly unfettered discretion in their choice of correspondents. In some circumstances TDC interference is warranted. For instance, the TDC may certainly deny inmates permission to correspond with individuals who object to receipt of further correspondence and may deny permission to correspond with minors whose parents object.[9] The TDC may also bar correspondence to and from individuals who attempt to introduce contraband or otherwise to commit serious violations of the correspondence rules. Such "negative mail lists" are less restrictive than the correspon-

---

7. Those criteria are as follows:
 a. The letter contains threats of physical harm against any person or place or threats of criminal activity.
 b. The letter threatens blackmail or extortion.
 c. The letter concerns sending contraband in or out of the institutions.
 d. The letter concerns plans to escape or unauthorized entry.
 e. The letter concerns plans for activities in violation of institutional rules.
 f. The letter concerns plans for criminal activity.
 g. The letter is in code and its contents are not understood by the reader.
 h. The letter solicits gifts of goods or money under false pretenses or for payment to other inmates.

i. The letter contains a graphic presentation of sexual behavior that is in violation of the law.
j. The letter contains information which if communicated would create a clear and present danger of violence and harm to a human being.

8. The proposed rules would change this situation somewhat. Rule 3.9.1.2 provides: "The fact that a would-be correspondent is a former felon, or any inmate of another unit of the TDC, is not alone sufficient justification for disapproval; any disapproval must be based on specified independent grounds."

9. Members of the public who find inmate mail threatening or offensive can always refer the correspondence to appropriate law enforcement agencies for action.

dence lists contemplated under the proposed rules and adequately protect TDC interests.

■ The most difficult problem this case presents for the court is the censorship, or "inspection" as defendants prefer to label it, of general correspondence. Plaintiffs urge that the reading of incoming and outgoing general correspondence chills the inmates' willingness to express themselves freely and deprives society of a complete perspective on prison conditions. Inmates fear retaliation for comments critical of TDC officials, and the evidence supplies some support for that fear. Plaintiffs point out that the bulk of mail handled by the TDC is so great that mail room officers have time only to glance cursorily at the general correspondence channeled through them.[10] They note further that the TDC allows confidential, unmonitored communications between inmates and their visitors. Finally, Plaintiffs emphasize that overall TDC security procedures are among the most stringent in the nation. From these facts plaintiffs draw the conclusion that the rule permitting censorship of general correspondence has only minimal effect upon prison security and order. They suggest that a "readable mail list" rule, allowing the TDC to read mail only of those inmates who abuse or plan to abuse correspondence, would restrict the first amendment rights of prisoners less, yet would accommodate legitimate TDC interests.

The court finds much of plaintiffs' argument persuasive, but must reach a contrary conclusion. The Supreme Court in *Procunier* unmistakably indicated that reading and censorship of prisoner mail is a constitutionally acceptable practice:

[T]he legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence. Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape plans or containing other information concerning proposed criminal activity, whether within or without the prison. Similarly, prison officials may properly refuse to transmit encoded messages. Other less obvious possibilities come to mind. . . .

416 U.S. at 412, 413, 94 S.Ct. at 1811. It is true that the TDC has not demonstrated with any certainty that elimination of censorship will result in a higher incidence of escape, smuggling, or other criminal activity. But the court must allow the prison administration some leeway in anticipating the consequences of uncensored correspondence. *Id.* at 414, 94 S.Ct. 1800. The "reasonable mail list" solution simply creates new problems. Devising a workable and precise standard for including inmates on such a list is difficult. The plan fairly invites TDC officials to single out the mail of notorious or troublesome inmates for perusal.

Although the chilling effect of censorship on prisoner correspondence is undeniable, the court finds that the right of TDC inmates to communicate fully and freely with special, attorney, and media correspondents ameliorates that problem to some extent. The court personally disputes the wisdom of reading incoming and outgoing general correspondence, but cannot hold the practice unrelated to the furtherance of any legitimate governmental interest.

■ Plaintiffs contend that certain of the standards used for rejecting incoming and outgoing general correspondence under the conditionally approved rules are vague and overbroad. Plaintiffs object to Rule 3.9.1.9(e) which allows rejection of any letter which "concerns plans for activities in violation of institutional rules," and to Rule 3.9.1.9(i) which bars letters containing "a graphic presentation of sexual behavior that is in violation of the law." The court agrees that both standards are impermissibly vague. *Procunier v. Martinez, supra; Guajardo v. McAdams, supra* at 219.

10. Approximately 112,000 pieces of mail a week are sent and received within the TDC system.

Although perhaps superficially unobjectionable, Rule 3.9.1.9(e) lends itself to the suppression of unwelcome criticism. For example, Rule 3.11(P) of the present TDC Rules and Regulations includes in a list of disciplinary infractions a "[d]isrespectful attitude or actions toward officers or employees of the Texas Department of Corrections." An overzealous mail room officer could readily decide that a letter critical of a warden or officer violated that rule. The court concludes that the Rule 3.9.1.9(e) standard encompasses protected as well as unprotected expression and gives defendants an excessive measure of discretion. Rule 3.9.1.9(i) is similarly infirm. It establishes mail room officers as arbiters of legal obscenity standards, a task which confuses and divides even experts. A rule which encourages officers to supply their personal views as standards for rejecting correspondence is necessarily suspect and, in this instance, does not withstand scrutiny. The court accordingly declares the censorship standards in Rule 3.9.1.9(e) and (i) vague and overbroad.

 Rule 3.9.12, the "Special Handling" rule, is also under attack. The rule authorizes a 48-hour delay of incoming mail "which would cause severe psychiatric or emotional disturbance" while the TDC notifies an appropriate official of the problem. The evidence in the case discloses that delay of mail often works a significant hardship on inmates. Although notification of a warden or chaplain may well serve to promote prison order or inmate rehabilitation in a given situation, the court perceives little justification for any delay in delivery of "disturbing" mail. The court therefore concludes that the rule imposes a burden on inmate correspondence greater than essential to security, order, or rehabilitation.

 One final point affecting general correspondence remains for resolution. Plaintiffs challenge the temporary suspension of correspondence of inmates in solitary confinement, a question expressly left open by the Supreme Court in *Procunier.* 416 U.S. at 411 n.12, 94 S.Ct. 1800. The conditionally approved rules permit a 15-day suspension of general and media correspondence when an inmate is in punitive segregation (solitary confinement) or when an inmate has willfully violated the mail regulations. The rules do not permit suspension of attorney or special correspondence. Rule 3.9.6.1. Since trial of the case, defendants have modified their position and now would suspend only outgoing general and media correspondence. The sole justification defendants offer in support of added restrictions on inmates in solitary is punishment. Defendants do not contend that suspension of general and media correspondence either improves security and order or facilitates inmate rehabilitation. Nor do they provide an explanation for their decision to suspend only outgoing correspondence. The court believes that any blanket suspension of correspondence unrelated to inmate abuse of the correspondence rules is unwarranted. The TDC may not infringe upon the first amendment rights of prisoners and their correspondence solely to enhance the punishment of inmates in solitary confinement.

## PUBLICATIONS

 Plaintiffs have two major objections to the manner in which publications are handled under the conditionally approved rules. First, they assert that the standards for rejecting publications are vague and arbitrarily enforced. The rules provide that books and magazines received by inmates are subject to rejection under the criteria governing general correspondence. Rule 3.9.13.6. Those criteria, while adequate to protect against risks to security and order contained in correspondence, are not suited to meet the peculiar problems presented by publications. Application of the general correspondence standards potentially results in the suppression of many publications clearly entitled to protection under the first amendment. For example, substitution of the word "publication" for "letter" in Rule 3.9.1.9(a) allows TDC censorship of any book or magazine which "contains threats of physical harm against any person or place or threats of criminal

activity." Substitution in other subsections of Rule 3.9.1.9 produces equally incongruous and untenable results.[11] Few publications could survive literal enforcement of those censorship standards.

Moreover, the evidence reveals that TDC review of publications under the existing rules is arbitrary and inconsistent. Publications may pass mail room scrutiny in one unit, yet fail in another depending upon the personal prejudices and opinions of the mail room officer involved. Adoption of the proposed rules would not relieve that problem.

The court concludes that censorship of publications is necessary to security, order, and rehabilitation only in limited circumstances. Legitimate prison interests certainly justify a prohibition of manuals which provide step by step descriptions of the manufacture of weapons, explosives, or drugs. Those interests also justify the exclusion of publications banned from the mails or judicially declared obscene. *See Hopkins v. Collins,* 411 F.Supp. 831 (D.Md. 1975); *Aikens v. Lash,* 390 F.Supp. 663 (N.D.Ind.), *vacated on other grounds,* 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976); *McCleary v. Kelly,* 376 F.Supp. 1186 (M.D.Pa.1974). The censorship possibilities under the proposed rules are far more extensive. The court declares that the standards for censorship of publications outlined in the proposed rules limit first amendment freedoms to a degree unnecessary to the protection of any governmental interest.

■ Plaintiffs' second objection is to the "publishers only" rule. The proposed rules allow inmates to receive publications only from a publisher or publications supplier. Rule 3.9.13.3. At trial, defendants agreed to modify the rule further to include bookstores as publications suppliers. Plaintiffs take the position that the rule imposes an unconstitutional limitation on the free expression and equal protection rights of inmates lacking funds to purchase new books. They find the rule particularly objectionable where legal material is involved, asserting that the rule then impairs the inmates' right of access to the courts as well.

The court cannot agree that the publishers only rule unreasonably burdens poorer inmates. The security risk created by permitting inmates to receive books from friends and relatives is significant. Detection of drugs and other contraband secreted in publications is difficult and sometimes impossible. *Woods v. Daggett,* 541 F.2d 237 (10th Cir. 1976). In order to conduct a thorough inspection, mail room officers would need to disassemble an incoming book almost completely. Inmates with no funds to purchase books are not left without an alternative. The Director of the TDC testified that inmates may always request publications through the prison library system. The court therefore finds no serious problem with the publishers only rule as it affects access to general publications.

■ The applicability of the rule to legal publications presents a closer question. The prisoners' right of access to the courts dictates that they have access to legal materials. *Cruz v. Hauck,* 515 F.2d 322, 331–33 (5th Cir. 1975); *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal.1970), *aff'd sub nom. Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971). To safeguard that right, the TDC maintains fourteen law libraries within the prison system. Each of those libraries contains a set of current reporters, statutes, and treatises.[12] The TDC also provides twelve attorneys prepared to assist inmates with any legal problems except for those relating to the operation of the prison. Furthermore, defendants' willingness to include bookstores as publications suppliers somewhat alleviates the

---

11. See n. 5, *supra.*

12. The Director of Staff Counsel for Inmates testified that the contents of these libraries include current sets of the Supreme Court Reporter, Federal Reporter, Federal Supplement, Vernon's Annotated Texas Statutes, Southwestern 2d Reporter, Texas Digest, Modern Federal Practice Digest, United States Code Annotated, Texas Jurisprudence 2d, Branch's Penal Code, Criminal Law Reporter, Shepard's Citations, Wright & Miller: Federal Practice and Procedure, and Texas Practice, Volumes I and II, as well as miscellaneous treatises.

problem of expense. Bookstores trading in legal materials frequently will have second-hand law books available for sale. The court finds that the TDC provides adequate legal material to protect the inmates' right of access to the courts, and declares the publishers only rule constitutional.

## PACKAGES

■ Plaintiffs contend that the proposed rule on packages, Rule 3.9.1.8, violates the inmates' fourteenth amendment right to equal protection. Inmates cannot obtain goods through the mail from friends and relatives, but must purchase items not provided by the TDC from the prison commissary. Plaintiffs maintain that the TDC's refusal to allow packages impermissibly discriminates against inmates without funds. The court finds that the potential security risk from packages is substantial and that problems of inspection are severe. Although the package rule does place indigent inmates at a disadvantage, the rule is not so arbitrary or discriminatory as to work a denial of their equal protection rights.

## POSTAGE

■ The final point of contention between the parties involves postage. Under the proposed rules, indigent inmates are not furnished postage and stationery until they are wholly without funds for 60 consecutive days. At the expiration of that period the TDC furnishes postage for unlimited letters to courts and attorneys, for a reasonable number of letters to special correspondents, and for one letter a week to other persons. Rule 3.9.8. Since the trial of this case, the TDC has agreed to waive the 60-day period

with respect to mail to attorneys and special correspondents. The TDC plans to charge amounts disbursed to indigent inmates for stamps during that period against any funds inmates should later receive. The court finds this modification insufficient. Depriving an inmate of the right to mail letters for a 60-day period places a substantial burden on his ability to communicate and on society's right to receive information.

The proposal submitted by plaintiffs is more satisfactory. Plaintiffs' formulation accommodates the inmates' first and fourteenth amendment rights without imposing an undue burden upon the TDC. Plaintiffs suggest that the TDC furnish postage and stationery to indigent inmates for special correspondence, for attorney correspondence, and for five additional letters a week. The TDC would disperse funds without regard to any waiting period, but would have the right to recoup amounts expended during the first 60 days an inmate is indigent from funds later deposited in the inmate's Trust Fund Account. This proposal preserves both the indigent inmate's right of access to the courts and his first amendment right to communicate with media and general correspondents at minimal expense and inconvenience to the TDC.[13]

Plaintiffs additionally suggest that inmates having a Trust Fund Account of ten dollars or less be classified as indigent. Although the TDC's definition of indigency, a zero balance, is hardly generous, the court can find no constitutional basis for requiring the TDC to adopt a more liberal standard.[14]

The court finds and declares that the conditionally approved correspondence rules

---

**13.** The present rule requires that the TDC furnish postage to indigent inmates for unlimited special and attorney of record correspondence and for one letter per week to general correspondents. Under that rule, the TDC has spent only an average of $429.72 annually over the last three years.

**14.** The flexible approach adopted by the United States District Court for the Southern District of Texas for determining whether an inmate may proceed in forma pauperis seems a more

equitable solution to the indigency problem. Depending upon numerous factors—the balance in an inmate's Trust Fund Account, the activity in his account, his prior financial records, and others—the court may allow the inmate to proceed without prepayment of court costs, may require full payment, or may require partial payment of such costs. United States District Court for the Southern District of Texas, General Order No. 77–1, April 13, 1977.

and regulations are unconstitutional in the ways set forth in this opinion, which constitutes the court's findings of fact and conclusions of law.

## ORDER

## ON ENTITLEMENT TO ATTORNEYS' FEES

■ Plaintiffs have requested an award of attorneys' fees from defendants in their official capacity. Defendants strenuously oppose that request. They argue that the enactment of the Civil Rights Attorney's Fees Awards Act of 1976, Public Law No. 94–559 (October 19, 1976), 42 U.S.C. § 1988 (Supp. Dec. 1976), did not lift the eleventh amendment bar to payment of attorney's fees by the state. Defendants argue alternatively that the court should not give the Act retroactive effect. The recent decision of the Fifth Circuit in *Rainey v. Jackson State College*, 551 F.2d 672 (5th Cir. 1977), disposes of both those contentions.

In *Rainey*, a suit filed under 42 U.S.C. § 1983 against Jackson State College, its president, and the officers and members of its board of trustees, the Fifth Circuit held first that the eleventh amendment no longer bars the award of attorney's fees against a state in actions brought under the statutes listed in the Civil Rights Attorney's Fees Awards Act of 1976. Secondly, the court held that the Act applies to pending cases. Those holdings demonstrate beyond doubt that an award of attorneys' fees is permissible in the present case.

■ The fact that neither the Texas Department of Corrections nor the State of Texas is a party to the suit is immaterial. As plaintiffs point out, the individual defendants may well have authority to disburse TDC funds under state law. *See* Tex.Rev.Civ.Stat.Ann. art. 6166j (Supp. 1976) (TDC shall delegate to the Director the authority to manage the prison system); *id.* art. 6166*l* (1970) (Director shall sign all warrants authorizing disbursements on account of the prison system). Even without state statutory authority, an award of attorneys' fees against the TDC or the state

is proper. The legislative history of the Civil Rights Attorney's Fees Act provides a clear account of congressional intent:

> [D]efendants in these cases are often State or local bodies or State or local officials. In such cases it is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party).

S.Rep.No. 94–1011, 94th Cong., 2d Sess. 5 (1976); U.S.Code Cong. & Admin.News 1976, p. 5913.

■ Attorney's fees under the Act are available only to "the prevailing party." Plaintiffs obviously meet that requirement. Although the court may not have agreed with plaintiffs on the extent of revision necessary in some areas of the rules, plaintiffs prevailed on all major issues in the case. Only on relatively minor issues were plaintiffs' arguments unsuccessful.

The court concludes that plaintiffs are entitled to a reasonable attorneys' fee as part of costs. All that remains is the determination of what fee is reasonable in this case. The court will be guided in deciding that question by *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and will hear evidence on the question on Friday, May 20, at 9:30 a. m., the time set in the court's previous Order of April 22, 1977.

## ORDER

## FIXING ATTORNEYS' FEES

In a previous Order, entered May 17, 1977, this court determined that plaintiffs are entitled to an award of reasonable attorneys fees in this case. The court has carefully considered the affidavits submitted by plaintiffs' attorneys, which set out the hours spent on various stages of the litigation (preparation of appellate briefs, pretrial preparation and discovery, negotiations and work regarding rules revisions, trial time, posttrial work on substantive

issues, time on attorneys fees issue) and the hourly rates requested. The court believes that the fees and costs plaintiffs seek are eminently reasonable in all but one particular.

In arriving at a figure representing reasonable attorneys fees, the court has been guided by the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974):

 (1) the time and labor required,

 (2) the skill requisite to properly perform the legal services,

 (3) preclusion of other employment by the attorney due to acceptance of the case,

 (4) the novelty and difficulty of the questions presented,

 (5) the customary fee,

 (6) whether the fee is fixed or contingent,

 (7) time limitations imposed by the client,

 (8) the amount involved and the results obtained,

 (9) the experience, reputation, and ability of the attorneys,

 (10) the undesirability of the case,

 (11) the nature and length of the professional relationship with the client, and

 (12) awards in similar cases.

The court has also found the recent decision of Judge Bue in *Cruz v. Beto*, Civil Action No. 71–H–1371 (S.D.Tex., March 3, 1977), most helpful in making the determination of reasonable fees and costs in this case.

■ The court is well acquainted with the efforts of plaintiffs' counsel over the past six years and is therefore in a better position than in other less exhaustively litigated cases to evaluate what fees are "reasonable." Although plaintiffs' counsel did not keep detailed time records during some stages of the case, the affidavits submitted adequately itemize the hours expended. Those hours certainly do not appear excessive. Defendants have not challenged the accuracy or adequacy of the affidavits in any event. The court sees no reason to

eliminate from the calculation hours spent during the previous appellate stages of this case. The court finds that the number of hours listed in plaintiffs' affidavits are reasonable and reflect labor necessary to the successful resolution of this case.

The court further finds that plaintiffs were ably served by their attorneys, who faced the task of dealing both with the complicated substantive questions presented in the case and with the procedural obstacles which cropped up regularly during the protracted course of this litigation. Plaintiffs' attorneys skillfully met all challenges.

The court notes that the attorneys involved devoted themselves to this civil rights class action without any expectation of payment, a fact which alone would make this case "undesirable." The court is also well aware that the class action aspects of the case imposed tremendous demands on plaintiffs' attorneys. Moreover, their work on this case clearly precluded the attorneys from taking other employment.

The reasonableness of the hourly rates now submitted is not challenged by defendants, and those rates certainly appear to be in line with customary local charges. The court therefore concludes that the total amount of attorneys fees sought in this case is reasonable and approves fees in the amount of $127,565. The court finds that plaintiffs are also entitled to recovery of the $6,672.20 claimed for costs incurred for travel expenses, telephone calls, and the like.

■ The only item of costs that the court will exclude is the $1,495 sought for law clerk services. It is the court's impression that law clerk programs are used by law firms for a variety of purposes. Firms hire law clerks not only to do legal research but also to give students exposure to the legal world, and recruit new lawyers for the firm, and to maintain ties with local law schools. The court therefore believes that an award of costs for law clerk services is inappropriate. The court finds that the costs for paralegal services and LEXIS time, a total of $4,557, are properly recoverable, however.

Defendants request that the court make findings of fact specifying the amount and nature of time spent by plaintiffs' attorneys in connection with both the settlement agreement, preliminarily approved on June 9, 1976, and the proceedings which followed. Defendants also request that the amount spent giving notice of the proposed settlement, a total of $7,872.60, be treated as an offset to the court's award of costs. It is defendants' position that plaintiffs unjustifiably reneged on settling this case and thus should receive no fees from the time spent negotiating towards the June settlement agreement up until the present. The court disagrees. As the court has previously stated, both the change in case law occasioned by *Taylor v. Sterrett*, 532 F.2d 462 (5th Cir. 1976), and the objections of the class necessitated renewed negotiations.[1] Had plaintiffs' attorneys acquiesced in the settlement agreement once such developments came to light, they clearly would have disserved their clients' interests. Defendants' charges of delay and implications of bad faith on the part of plaintiffs' attorneys are wholly unwarranted. Defendants' requests are accordingly denied.

To summarize, the court orders that plaintiffs recover their costs including:

| | |
|---|---|
| Attorneys fees | $127,565.00 |
| Disbursements | 6,672.20 |
| Paralegal services | 4,515.00 |
| LEXIS time | 42.00 |
| | $138,794.20 |

---

1. Memorandum and Order of April 22, 1977, at p. 1377.