David RUIZ, et al., Plaintiffs,

United States of America,
Plaintiff-Intervenor,

v.

W.J. ESTELLE, et al., Defendants.

No. H–78–987–CA.

United States District Court,
S.D. Texas,
Houston Division.

Nov. 17, 1982.

See also 5 Cir., 679 F.2d 1115, 688 F.2d 266, and D.C., 503 F.Supp. 1265.

William Bennett Turner, San Francisco, Cal., Steven L. Winter, New York City, for plaintiffs.

David J.W. Vanderhoof, Sp. Litigation Section, Dept. of Justice, Washington, D.C., for plaintiff-intervenor.

Mark White, Atty. Gen. of Tex., Austin, Tex., Brian S. Greig, William R. Pakalka, Sp. Asst. Attys. Gen., Houston, Tex., for defendants.

## ORDER

### I.

JUSTICE, Chief Judge.

The above-styled civil action was instituted a decade ago, in 1972, by David Ruiz and other inmates of the Texas Department of Corrections (TDC), who sought equitable relief from allegedly unconstitutional conditions prevailing in TDC. After more than six years of discovery, hearings, and pre-trial proceedings, trial commenced on October 2, 1978. After 159 days of trial, including one significant delay, the parties rested on September 20, 1979.[1]

On December 12, 1980, a memorandum opinion was entered, which found widespread constitutional violations in the manner that various prison units of TDC were maintained and operated. *Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D.Tex.1980) (hereinafter cited by volume and page number only). The memorandum opinion set forth, in considerable detail, the factual and legal analyses upon which the conclusions of unconstitutionality were based. Additionally, it indicated generally the nature of the injunctive relief being considered, and gave the parties an opportunity to agree on a proposed judgment. On March 3, 1981, the court approved a consent decree, submitted jointly by the parties, which resolved a number of the substantive issues upon which plaintiffs had prevailed at trial.[2]

On April 20, 1981, a decree granting injunctive relief and declaratory judgment was entered concerning the issues not re-

---

1. The procedural background of this action is set forth in detail in the memorandum opinion, *Ruiz v. Estelle,* 503 F.Supp. 1265 (D.D.Tex. 1980). *See also Ruiz v. Estelle,* 679 F.2d 1115, 1128 n. 18 (5th Cir.1982).

2. The parties agreed on provisions concerning: (a) health care, except for the continued use of the Huntsville Unit Hospital; (b) the conditions of confinement of mentally retarded and physi-

cally handicapped inmates; (c) the conditions of solitary confinement; (d) the rules concerning the use by inmates of chemical agents; (e) work safety and hygiene in TDC inmate work operations; (f) procedures for administrative segregations of inmates. The consent decree is reproduced as Appendix A to the recent opinion of the Court of Appeals for the Fifth Circuit, *Ruiz v. Estelle,* 679 F.2d at 1165–1168.

solved by the first consent decree.[3] The decree found specific, inherent equitable power to remedy the unconstitutional conditions found to be prevailing in TDC. Defendants appealed from this order. During the pendency of appeal, the parties agreed to a second consent decree, which modified two central portions of the injunctive decree and which, on the bases of such alterations, finally resolved the two issues. Pursuant to Rule 42(b), F.R.App.P., defendants moved for voluntary dismissal of their appeal of those provisions of the injunctive order which were superseded by the second consent decree.[4] The remainder of the injunctive order, and also defendants' appeal therefrom, were unaffected by the second consent decree.

Defendants did not appeal from Section X of the injunctive decree. *Ruiz*, 679 F.2d 1115, 1164 (5th Cir.1982). That portion provides:

> The class plaintiffs are entitled to recover from defendants their counsel's reasonable fees and costs, pursuant to 42 U.S.C. § 1988. Plaintiffs' counsel and defendants' counsel are directed to endeavor to agree on the amount thereof. If they are unable to agree, plaintiffs may submit an appropriate motion to the court, and the court will fix the amount of fees and costs. Plaintiffs may file later applications for services rendered by their counsel in implementing the relief specified in this decree and the consent decree agreed to by the parties, and for further services in this action.

See *Ruiz*, 666 F.2d at 855, 873 (5th Cir.1982). Despite apparent willingness on the part of plaintiffs' counsel to enter into discussion concerning a "reasonable" attorneys' fee, the parties have been unable to reach an agreement on this matter.[5] Accordingly, as provided in Section X of the injunctive decree, plaintiffs submitted a motion for attorneys' fees, pursuant to the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988.[5a]

> As set forth in my declaration dated December 30, 1981, in support of our motion to compel discovery on counsel fees and costs, which I incorporate herein, I made a settlement offer to defendants and supplied their counsel with voluminous information in support of our offer. Defendants made no response to the settlement offer, made no offer of their own, and never indicated any willingness to pay any specific amount whatever by way of counsel fees and costs.... The most recent in-person conference was on January 27, 1982. [Defendants' counsel] informed me that he had no authority to offer any fees at all. He said that he or [another attorney] would be in touch with me shortly with an offer. No offer has been forthcoming. I have subsequently informed defendants' counsel that, though I was willing to discuss settlement at any point, in the absence of any willingness by their clients to pay any fees, I had no alternative but to file this motion.

---

**3.** The original decree was altered by an amended decree, entered May 1, 1981. The amended decree is reproduced as an Appendix to an opinion of the Court of Appeals for the Fifth Circuit, *Ruiz v. Estelle*, 666 F.2d 854, 862–73 (5th Cir.1982) (*Ruiz II*). Unless otherwise noted, all references to the decree are to the amended version, entered May 1, 1981.

**4.** The second consent decree, approved June 1, 1982, is a stipulated modification of Sections II(A) and II(D) of the amended decree, relating to security staff and the use of inmates as "building tenders". Defendants initially appealed from these portions. On March 15, 1982, a hearing on the state of defendants' compliance with II(D) commenced. After a week of testimony, the parties requested a recess, to enable them to enter into negotiations on that issue, and the related issue of security staffing. A joint agreement on both subjects was submitted to, and preliminarily approved by, the court. After a hearing to enable class members to object to the provisions of the stipulated modification, the agreement was finally approved.

**5.** Rule 15(A) of the Local Rules for the Southern District of Texas requires that, upon submission of a motion, the party submitting the motion certify that he has conferred with opposing counsel, and that counsel are unable to reach an agreement upon the disposition of the matters raised by the motion. In his rule 15(A) certificate, plaintiffs' lead counsel states:

**5a.** By an order entered July 21, 1977, plaintiffs were awarded a small amount of attorneys's fees, *pendente lite*, for services performed in preparation of this litigation for trial. Defendants' appeal from this order was dismissed by the Court of Appeals for the Fifth Circuit. 609 F.2d 118 (5th Cir.1980) (*Ruiz IV*). Defendants did not appeal from the order, as part of its appeal from final judgment. *See Ruiz*, 679 F.2d at 1128 n. 4.

At the time the motion was submitted, defendants' appeal was pending before the Court of Appeals for the Fifth Circuit. Though defendants did not appeal from Section X, they did challenge on appeal the factual and legal conclusions of the injunctive decree. Plaintiffs' entitlement to attorneys' fees under § 1988, as set forth in Section X, was predicated on their having prevailed, at trial, on the claims set forth in their complaint concerning the unconstitutionality of conditions at TDC. As set forth in the memorandum opinion of December 12, 1980, and the accompanying injunctive decree of May 11, 1981, plaintiffs there prevailed on every substantial issue presented at trial. A large portion of the equitable relief secured by the plaintiff class was embodied in consent decrees, and could not be disturbed on appeal. Nonetheless, it was taken into account that, were the Court of Appeals for the Fifth Circuit to reverse the findings of fact and conclusions of law relating to the basic unconstitutionality of conditions in the prisons of TDC, plaintiffs' right to recovery of fees and costs could be compromised. *See Laje v. R.E. Thomason General Hospital,* 665 F.2d 724, 730 (5th Cir.1980). In view of this uncertainty, the motion for attorney's fees was held in abeyance, pending resolution of defendants' appeal.

## II.

On June 23, 1982, the Court of Appeals for the Fifth Circuit, issued its opinion in this action. *Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.1982) (cited hereinafter as *Ruiz,* 679 F.2d at 1126). Because plaintiffs' entitlement to fees and costs, and also the extent of such recovery, is directly implicated in the decision of this action on appeal, the content of the lengthy and complex opinion of the Court of Appeals for the Fifth Circuit will be set forth in some detail. (The effect of the various provisions of the appellate decision on the amount of recovery will be analyzed separately.)

In its opinion, the Court of Appeals "affirm[ed] the district court's finding that TDC imposed cruel and unusual punishment on inmates in its custody as a result of the totality of conditions in its prisons." *Ruiz,* 679 F.2d at 1126. It "also affirm[ed] the district court's finding that some of TDC's practices deny inmates due process of law." *Id.* Finally, the court "affirm[ed the] conclusion that remedial measures are necessary." *Id.*[6] Thus, the Court of Appeals' decision denoted the plaintiffs' success on their central claims that the conditions prevailing in the various units of the Texas Department of Corrections deprived inmates of rights secured to them by the Eighth and Fourteenth Amendments of the United States Constitution.

The remainder of the appellate decision is devoted to a lengthy and detailed assessment of whether specific injunctive measures ordered in the equitable decree of May 1, 1981, were necessary to ameliorate the unconstitutional conditions of confinement in TDC. In the course of this complicated evaluation, the court affirmed a number of provisions of the injunctive order, 679 F.2d at 1164, concluding that these provisions were properly within the scope of the district court's power to remedy unconstitutional conditions. *E.g.,* 679 F.2d at 1148 (affirming dormitory space requirements); p. 1152 (affirming administrative segregation exercise requirement); pp. 1155–1156 (requiring taping of disciplinary proceedings); pp. 1153–1155 (access to courts requirements). *See also,* 679 F.2d 1155, n. 204, and cases cited therein.

On other matters, the Court of Appeals "conclude[d] that some of the remedial measures ordered are not demonstrably required to protect constitutional rights and intrude unduly on matters of state concern." 679 F.2d at 1126. On the basis of this conclusion, the court "narrow[ed] the scope of relief ordered." *Id.* The major portion of this tailoring is governed by a self-described "wait and see approach."

---

**6.** Additionally, the Court of Appeals rejected unequivocally defendants' general challenges to the fairness of the trial, the sufficiency of the district court's findings of fact, and the order allowing the United States to intervene as plaintiff. *Ruiz,* 679 F.2d at 1129–1132.

For example, with respect to the various measures ordered to ease the chronic overcrowding of TDC units, the Court of Appeals noted:

It has not been demonstrated that provision of additional security guards and other measures required by the district court decree and the two consent decrees will not remedy the constitutional deficiency. It appears desirable, therefore, first to undertake measures that will not be both costly and irreversible. If these measures do not work then additional ones may be necessary. This "wait and see" approach ensures that the intrusion into state processes will be no greater than that required to achieve compliance with the Constitution.

*Id.* at 1148. *See also* 1148–1149 (staff training). The practical effect of this "wait and see" approach is to vacate, without prejudice, certain provisions of the injunctive decree. *See* 679 F.2d at 1164. The Court of Appeals has, then, explicitly affirmed that the conditions of confinement are violative of the Constitution. Additionally, it has approved the requirement that TDC take certain specific measures to remedy those conditions. If, after implementation of those approved remedies, the conditions of confinement remain in violation of the constitutional standards for confinement of inmates, plaintiffs may seek further relief, either in the form contained in the sections vacated without prejudice or in some alternative manner.

Finally, the Court of Appeals vacated a number of specific provisions of the injunctive decree. *Id.* at 1165. The basis for the vacation of these provisions was, generally, that the specific measures ordered unduly intruded on matters properly within the province of the state's prison administrators. Also, the court concluded that the district court had improperly resolved certain substantive matters, on the bases of state law claims which were not before it, because neither the plaintiffs nor the plaintiff-intervenor had included pendent state law claims in their complaints. *Id.* at 1156–1159.

As the foregoing discussion makes clear, the opinion of the Court of Appeals is intricate and not easily summarized. However, it may safely be said that the major portion of the decision is directed toward the assessment of the proper balance between the equitable power of a district court to remedy existing constitutional violations in prisons, *Procunier v. Martinez,* 416 U.S. 396, 404–407, 94 S.Ct. 1800, 1807–1808, 40 L.Ed.2d 224 (1974), and the need to preserve the discretion properly allocated to prison administrators. *See generally, Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). As the opinion of the Court of Appeals indicates, the proper balance in a given case will vary from time to time, as certain remedies implemented pursuant to court order or consent decree alter the prevailing conditions. Remedial measures that at one time may seem unduly intrusive may, at a later date, appear necessary to preserve the constitutional rights of inmates. On the other hand, certain injunctive provisions may be "phased out", as the totality of conditions obtaining in a prison gradually improves.

This entire process, *i.e.,* careful assessment by the district court of the competing concerns involved in prison litigation, is triggered by a clear demonstration that the prevailing conditions do not meet the minimum constitutional standards for confinement of prison inmates. The Court of Appeals' decision in this action was unequivocal, in affirming that plaintiffs convincingly made the requisite showing, and that they were entitled to equitable relief. Only the precise contours of that relief remain in dispute. As the Court of Appeals pointed out:

The first and second consent decrees settled many of the controverted issues, to which much of the trial testimony was devoted. *On the matters covered by the consent decrees, their provisions were substantially the same as the remedies outlined by the district judge in his opinion. In addition, TDC does not contest many of the provisions of the district*

*court's decree* [concerning quadruple-celling, triple-celling, use of force, disciplinary practices and procedures, recreation for death row inmates, triple-celling in administrative segregation, vague rules and specific reporting requirements concerning population]. [Emphasis added.] 679 F.2d at 1132. Thus, not only did plaintiffs prevail on their basic claims concerning the unconstitutionality of conditions in TDC, but they also secured equitable relief in a large number of the specific substantive areas as to which they presented evidence. The partial reversal embodied in the decision of the appellate court is limited to remedial measures adopted by the district court, some not necessarily advocated by plaintiffs. As the Court of Appeals stated:

> The [court below] gave lengthy and careful attention both to the trial of this case and to the fashioning of the reparative injunction. In many instances, the decree he shaped is focused directly on steps to remedy the aspects of confinement that together make it cruel and unusual.... Considering both the constitutional violations to be excised and the scope of the therapy directed, we are left with the conviction that, without the guidance now provided by *Rhodes v. Chapman* [452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59], the district court adopted some remedies that are not essential for the elimination of unconstitutional prison conditions.... [T]he remedy should begin with what is absolutely necessary. If these measures later prove ineffective, more stringent ones should be considered.

*Id.* at 1145. Giving careful attention to these principles and conclusions, the plaintiffs' motion for an award of attorneys' fees will be evaluated accordingly.

## II.

██ The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, provides, in relevant part:

> In any action to enforce [42 U.S.C. § 1983], the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs.

Under this section, a successful plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." S.Rep. No. 94–1011, 94th Congress, 2d Session, 4, reprinted in 1976 U.S.Code Congressional and Administrative News 5908, quoting *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). In the absence of any special circumstances, plaintiffs who have prevailed in an action brought pursuant to § 1983 should receive fees as a matter of course. *Accord Davis v. Murphy,* 587 F.2d 362, 364 (7th Cir.1978).

██ As above indicated, Section X of the amended decree of May 1, 1981, stated that "plaintiffs are entitled to recover from defendants their counsel's reasonable fees and costs, pursuant to 42 U.S.C. § 1988", and defendants did not appeal from this provision of the decree. Noting this fact, the Court of Appeals held that defendants thereby waived any objections to that provision, and, consequently, it was affirmed. *Ruiz,* 679 F.2d at 1164. On the basis of this conclusion by the Court of Appeals, plaintiffs' right to recover fees under § 1988, as provided in Section X, seems secure.

Nonetheless, one matter should be discussed in the wake of the appellate ruling. An entitlement to attorney's fees is based on prevalence by the plaintiffs on their claims. If the ruling of the trial court in favor of plaintiffs is reversed on appeal, the necessary predicate of an award under § 1988 is removed; that is, plaintiffs must legitimately be the prevailing parties, *after appeal,* in order to recover fees under § 1988.

As the foregoing discussion of the ruling of the Court of Appeals makes clear, plaintiffs are plainly prevailing parties, after appeal. The fundamental findings with respect to plaintiffs' constitutional claims were affirmed, as well as a substantial share of the specific remedial measures ordered by the district court to repair demonstrated constitutional infirmities. *Ruiz,* 679 F.2d at 1164. Moreover, defendants did not

appeal from a number of the reparative measures ordered by the court. *Id.* at 1164. Additionally, "[t]he first and second consent decrees settled many of the controverted issues, to which much of the trial testimony was devoted." *Id.* at 1132. Finally, nearly all of the remaining portions of the injunction which were vacated, without prejudice, affect areas in which plaintiffs actually prevailed on their constitutional claims. The action of the Court of Appeals in vacating these measures is a product of the doctrine of equitable prudence; in no wise does it reflect a failure of the plaintiffs' case on the merits.

The Court of Appeals for the Fifth Circuit has recently ruled that the proper focus for determining whether a party is the "prevailing party" for the purposes of resolving applications for attorneys' fees is whether that party prevailed on the "central issue" in the case. *Taylor v. Sterrett,* 640 F.2d 663 (5th Cir.1981); *see also Ramos v. Koebig,* 638 F.2d 838, 845 (5th Cir.1981). In the present action, there can be no doubt that plaintiffs' prevailed on the "central issue" in the case—the constitutionality *vel non* of conditions in the prison facilities of the Texas Department of Corrections. The Fifth Circuit has also suggested that attention be directed toward the relief secured by the plaintiffs. *Taylor v. Sterrett, supra,* 640 F.2d at 669; *Maher v. Gagne,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). It is beyond question that § 1983 plaintiffs who have won relief through consent decrees, rather than final court judgments, are entitled to fees pursuant to § 1988. *Maher v. Gagne, supra,* 448 U.S. at 129–130, 100 S.Ct. at 2574–2575, citing S.Rep. N. 94–1011, at p. 5; *see also Williams v. Leatherbury,* 672 F.2d 549, 550 (5th Cir.1982), and

cases cited therein. Plaintiffs are clearly entitled to recover attorneys' fees in this action.[7]

## IV.

In their submission in this matter, defendants have raised two arguments of a general nature against the plaintiffs' motion for an award of attorneys' fees: first, that such an award is barred by the Eleventh Amendment to the United States Constitution; second, that "§ 1988 does not provide for recovery for periods prior to its enactment." Defendants advanced these arguments in prior pleadings in this action, and have incorporated them by reference in their present pleadings. The arguments are entirely futile, and have been foreclosed by numerous controlling decisions.

Three decisions of the United States Supreme Court have upheld awards of attorney's fees, pursuant to § 1988, against state defendants. *Maher v. Gagne,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). The last named case explicitly held that awards of attorney's fees are not barred by the Eleventh Amendment, on the basis of a lengthy analysis of the common law governing awards of costs, and the statutory history of § 1988, as well. 437 U.S. at 695–700, 98 S.Ct. at 2575–2578. In *Maher v. Gagne,* the Court noted that petitioner's argument that attorney's fee awards are barred by the Eleventh Amendment "is foreclosed by our decision in *Hutto v. Finney.*" 448 U.S. at 131, 100 S.Ct. at 2575. The holdings of the Court of Appeals are equally clear on this point. *See, e.g.,*

---

7. As constitutional claims raised in § 1983 actions have been increasingly complicated and intertwined, "the degree to which counsel have prevailed in the law suit has become a factor in determining the appropriate amount of attorney's fees to be awarded." *Jones v. Diamond,* 594 F.2d 997, 1027 (5th Cir.1979) *modified* 636 F.2d 1364 (5th Cir.1981) (*en banc*). Therefore, in actions such as this, there are actually two separate though related inquiries mandated by the presence of a variety of legal and factual issues in one action: first, the threshold issue discussed here, that is, whether plaintiffs may properly be considered "prevailing parties" within the meaning of the statute. If that preliminary question is resolved in favor of the plaintiffs, then a second question must be addressed, specifically, the extent to which plaintiffs have prevailed. This second issue will be discussed under the rubric "Time and labor required," Section VI(1) below.

*Gates v. Collier,* 559 F.2d 241 (5th Cir.1977); *Morrow v. Dillard,* 580 F.2d 1284, 1298 & n. 17 (5th Cir.1978).

The defendants' argument with respect to the non-retroactivity of § 1988 is no more tenable. In two of the cases cited above, the Supreme Court explicitly held that fees could be recovered for legal services performed prior to enforcement of the Act. *Supreme Court of Virginia v. Consumers Union,* 446 U.S. at 728 n. 7, 100 S.Ct. at 1972 n. 7; *Hutto v. Finney,* 437 U.S. at 694–95 n. 23, 98 S.Ct. at 2575 n. 23. In the third of the three cases, the Court did not directly address the issue, but approved an award of attorney's fees which plainly included compensation for pre-Act services. *Maher v. Gagne,* 448 U.S. at 124–127, 100 S.Ct. at 2572–2573. The holdings of the Court of Appeals for the Fifth Circuit on this point are unanimous, and they are abundantly clear. *See, e.g., Jones v. Diamond,* 636 F.2d 1364, 1381 (5th Cir.1981) (*en banc*), and cases cited therein. The House Report accompanying § 1988 explicitly states: "In accordance with applicable decisions of the Supreme Court, the bill is intended to apply to all cases pending on the date of enactment." H.Rep. No. 94–1558, p. 4, n. 6. (1976). Indeed, there does not appear to be a single reported case supporting defendants' argument concerning the supposed non-retroactivity of § 1988.

## V.

The Texas State Legislature, convened in a special session, recently enacted a measure, purporting to limit the amount of state funds that might be expended in payment of attorney's fees to plaintiffs bringing actions against TDC. In relevant part, the bill states:

> No state funds shall be expended in excess of $10,000 for plaintiff's attorney's or attorneys' fees, court costs, or other plaintiff's expenses in any one suit brought against the Texas Department of Corrections or any employee thereof unless the expenditure of said funds is specifically authorized by an appropriations act of the legislature . . . .

H.B. No. 9, Section 5, 67th Legislature, Second Called Session (1982). On its face, the bill seems applicable to the present motion for attorneys' fees.

However, a recent opinion by the Attorney General of Texas, issued at the request of the Honorable Bob Bullock, Comptroller of Public Accounts of the State of Texas, states that the above-quoted provision acts only as a limitation on the expenditure of those funds appropriated during the second called session of the legislature. Tex. Att'y Gen. Op. No. MW–498 (1982). Since the funds appropriated in H.B. No. 9 were specifically earmarked for construction of new prison facilities and employment of additional security personnel, it appears unlikely that any attorney's fees awarded in this action would be drawn from funds appropriated during the 1982 special session. Therefore, H.B. 9 apparently does not affect the present application.

Nonetheless, it should be made clear that the provision quoted above may not operate as a limitation on recovery of attorney's fees awarded pursuant to § 1988. The Court of Appeals for the Fifth Circuit has held, on three separate occasions, that the Supremacy Clause, Article VI, Clause 2, of the United States Constitution requires that federal court orders awarding fees under § 1988 prevail over any state statutory limitation on such awards. *Gary W. v. State of Louisiana,* 622 F.2d 804 (5th Cir. 1980) (state constitutional provision—Louisiana); *Gates v. Collier,* 616 F.2d 1268 (5th Cir.1980) (state statute—Mississippi); *Collins v. Thomas,* 649 F.2d 1203 (5th Cir.1981) (state statute—Texas). As the Court of Appeals noted in *Collins v. Thomas,*

> [t]he district court's authority to award attorney's fees is established by § 1988 which is a Congressional enactment pursuant to Section 5 of the Fourteenth Amendment. To the extent that § 1988's authorization of district court orders awarding attorney's fees conflicts with Texas restrictions on the execution of judgments against counties, the federal statute must prevail over state law.

649 F.2d at 1206. At issue in *Collins v. Thomas* was the Texas statute forbidding execution of judgments against counties. Tex.Rev.Civ.Stat.Ann. art. 1575 (Vernon 1962). The other two actions involved state law provisions which were substantially identical to the provisions of H.B. 9, in that they purported to require specific legislative authorization for the expenditure of state funds for counsel fees. Thus, to the extent it operates, in any manner, to limit plaintiffs' recovery of attorneys' fees pursuant to Section X of the Amended Order of May 1, 1981, and this order, H.B. 9 is invalid.

## VI.

Section 1988 specifies that an award of attorney's fees be "reasonable." The contours of reasonableness are defined by the twelve factors for evaluating attorney's fee awards set forth by the Court of Appeals for the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974); *see also* Code of Professional Responsibility, DR 2-106. Those factors will be considered, *seriatim.*

### 1. TIME AND LABOR REQUIRED.

As noted, litigation of this action has taken over ten years, and the end is not yet in sight. Accordingly, the amount of time expended by plaintiffs' counsel in the preparation and litigation of this claim, throughout the various stages of the action, was substantial. Plaintiffs' attorneys are, of course, not required to reduce or otherwise trim the time they spend on actions such as this, merely because litigation will be protracted, and the total amount of time, when viewed in its entirety, will be sizeable. It has been plainly stated by the Court of Appeals that attorneys in § 1983 actions should be compensated for their work in the same manner as attorneys involved in other types of equally complex federal litigation. *Jones v. Diamond, supra,* 636 F.2d at 1381. It would be unconscionable, therefore, for an attorney representing a class of § 1983

plaintiffs to spend less time on such actions, simply because a subsequent application for attorney's fees might involve a large number of hours; moreover, a reviewing court should not shy away from such claims. Rather, the hours claimed should be carefully scrutinized, to insure that they were reasonably spent in the conscientious pursuit of legitimate constitutional claims. *Id.* at 1382.

In the present action, this evaluation involves a number of exceedingly involved matters. First, the resolution of the action on appeal, conjointly with the open-ended nature of the decision of the Court of Appeals, requires that the extent of plaintiffs' prevalence on the merits be assessed. *See, supra,* note 7. Second, the duration and sheer magnitude of this action render the task of assessing the hours claimed particularly cumbersome. Third, defendants have lodged a substantial number of generalized objections to the manner in which plaintiffs have supported their claim for fees. These challenges are directed at the sufficiency of the time records submitted by plaintiffs' counsel, and a variety of other matters which, in the view of defendants, undermine plaintiffs' claim.

#### A. Extent of prevalence

Neither § 1988, nor the criteria set forth in *Johnson v. Georgia Highway Express, supra,* provide an answer to an increasingly common difficulty, which is dramatically presented in this action. The statute speaks of the "prevailing party" being entitled to an award of attorney's fees. In actions in which plaintiffs have asserted a simple cause of action or in which plaintiffs have plainly prevailed on *all* issues raised in their complaint, assessment of an appropriate award of attorney's fees may be based on *all* time reasonably spent on the action. However, problems in this relation have arisen in actions involving several claims, as to which the plaintiffs have prevailed on only a limited number.[8]

---

**8.** Representative of such actions are those in which plaintiff has alleged deprivation of both

procedural due process rights, and a substantive liberty/property interest. Such cases of-

In such cases, the theory has been advanced that the prevailing party should recover fees only for time spent on the issues on which it has prevailed. In *Familias Unidas v. Briscoe,* 619 F.2d 391 (5th Cir.1980), the court stated:

> The amount of attorney's fees awarded plaintiffs ... should be based upon only the work performed on the issues on which they were successful.

619 F.2d at 406, citing *Nadeau v. Helgemoe,* 581 F.2d 275, 278 (1st Cir.1979).

The idea of proportional awards for partial success by § 1983 plaintiffs has an alluring aura of mathematical precision. However, application of the principle is difficult, even in the simplest of cases. Even before the particular problem under analysis arose, the Court of Appeals for the Fifth Circuit had cautioned that the determination of a reasonable attorney's fee was not a matter of precise calculation. *See Johnson v. Georgia Highway Express,* 488 F.2d at 720. In actions as intricate as the present one, the notion that time spent over the course of eight years may be divided neatly among issues is not worthy of serious consideration. Nor does the prevailing law of the Fifth Circuit require such futile endeavors.

The decision in *Familias Unidas* is the only decision in this circuit which apparently adopts, without equivocation, the doctrine of proportional recovery. In setting forth that principle the court cited a holding of the Court of Appeals for the First Circuit, *Nadeau v. Helgemoe,* 581 F.2d 275 (1st Cir.1978). *See Familias Unidas,* 619 F.2d at 406. The Court of Appeals for the Ninth Circuit apparently has adopted a similar rule. *See Sethy v. Alameda County Water District,* 602 F.2d 894 (9th Cir.1979), *cert. denied,* 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). However, after the decision in *Familias Unidas,* another panel of the Fifth Circuit reviewed the issue, and concluded that unquestioning reliance on *Nadeau* and *Sethy* was not justified, and

ten involve claims on which plaintiffs' likelihood of prevailing is disparate. *See, e.g., Mus-*

the holding in the *Familias Unidas* was modified.

In *Miller v. Carson,* 628 F.2d 346 (5th Cir.1980), the court reviewed a claim for attorney's fees for time spent seeking compliance with an injunctive decree. The party seeking fees had succeeded in their endeavor to have the decree enforced, though certain of the motions filed toward that end had been denied. Thus, the petition for fees was "mixed." The defendants, in opposing the fee award, cited *Nadeau* and *Sethy* to support their advocacy of the proportional recovery doctrine. The Court of Appeals for the Fifth Circuit held:

> Because issues may at times be reasonably related, we reject anything in *Nadeau* or *Sethy* which insists that a district court must always sever an attorney's work into "issue parcels" and then assess that work for purposes of a fee award in terms of the outcome of each issue standing alone.

628 F.2d at 348, citing *Panior v. Iberville Parish School Board,* 543 F.2d 1117, 1119 & n. 2 (5th Cir.1976) (discussing legislative history); *Watkins v. Scott Paper Co.,* 530 F.2d 1159, 1198 n. 53 (5th Cir.1976), *cert. denied,* 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976).

On several other occasions, panels of the Court of Appeals for the Fifth Circuit have implicitly rejected the principle of precise separation of time claimed into "issue parcels" for the purpose of awarding attorney's fees. In *Hardy v. Porter,* 613 F.2d 112 (5th Cir.1980), the court held that a plaintiff's attorney was not entitled to fees for time spent exclusively in pursuing a claim on which plaintiff had not prevailed. However, the court remanded the case to the district court, which had, in its initial award, relied on an artificial division of time spent into time units spent on each issue. The court noted that

> [a]lthough the [district] court correctly stated in its order that the attorneys are not entitled to fees for time spent unsuc-

*care v. Quinn,* 614 F.2d 577 (7th Cir.1980).

cessfully pursuing [one of plaintiff's claims], it is not clear that the court considered the possibility that some of the evidence gathered in preparing the case on that issue also was relevant to the [claim on which plaintiff *did* prevail]. If there was any overlap, the attorneys should be compensated for the time spent gathering the evidence.

613 F.2d at 114.

When faced with intertwined claims, district courts have attempted to discern the presence of an overlap in time spent on successful and unsuccessful claims. As might be expected, this inquiry has typically yielded the common-sense conclusion that, in most instances, the overlap is substantial, and neat separation impossible. *See, e.g., United States v. Terminal Transport Co.,* 653 F.2d 1016, 1020 n. 10 (5th Cir.1981) ("We are persuaded that the district court ... reasonably concluded that 'where, as here, it is impossible to allocate time among successful and unsuccessful claims and the plaintiffs have prevailed in the greater part of their case, time spent in good faith on the preparation and pursuit of unsuccessful claims should not be excluded in computing the fee award.' [*Allen v. Terminal Transport Co., Inc.*] 486 F.Supp. [1195] at 1201."); *Smith v. Fletcher,* 559 F.2d 1014, 1018 n. 9 (5th Cir.1977) ("Finally, [defendant] argued ... that the court should apportion [attorney's] fees as to time spent on the sex discrimination claim and time spent on the physical handicap discrimination claim. We agree with the [district] court that the issues were so intertwined as to make such a division impossible.")

The Court of Appeals for the Fifth Circuit, sitting *en banc,* has indicated unequivocally that it does not approve the doctrine of proportional recovery in complex § 1983 actions, especially those involving the assertion of the constitutional rights of prisoners. In *Jones v. Diamond, supra,* the court noted:

> In fixing the [attorney's] fee, the district court should be mindful that in complex civil rights litigation, and particularly in

prisoner's rights cases, issues are overlapping and intertwined. In order to represent their clients adequately, attorneys must explore fully every aspect of the case, develop all of the evidence and present it to the court. Time spent pursuing unsuccessful claims that are clearly without merit should be excluded. However, the mere fact that the litigants did not succeed in obtaining a judgment on all of the claims asserted does not mean that time spent pursuing these claims should automatically be disallowed.... Instead, the court must consider the relationship of the claims that resulted in judgment with the claims that were rejected, and the contribution, if any, made to success by the investigation and prosecution of the entire case.

636 F.2d at 1382 (citations omitted). *Accord Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624, 636 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980). As a basis for this holding, the Court of Appeals for the Fifth Circuit turned to the legislative history of the Civil Rights Attorney's Fee Award Act. In the report accompanying that legislation, the Senate noted:

> It is intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases .... In computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, "for all time reasonably expended on a matter."

S.Rep. No. 94–1011, at 6, reprinted in 1976 U.S.Code Congressional and Administrative News, at 5913. *See, also, id.* at 5912 ("In appropriate circumstances, counsel fees under [§ 1988] may be awarded pendente lite. Such awards are especially appropriate where a party has prevailed on an important matter in the course of litigation, even when he does not prevail on all issues.").

As an example of a case in which the court "correctly applied" the "appropriate standards" (as set forth in *Johnson v. Geor-*

*gia Highway Express, supra*), the Senate Report on § 1988 and the Court of Appeals for the Fifth Circuit (in *Jones v. Diamond, supra,* 636 F.2d at 1382) both cite *Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal. 1974), *aff'd* 550 F.2d 464 (9th Cir.1977), *reversed on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). In view of this approval, in both the legislative history *and* the controlling opinion in this Circuit, careful attention to the opinion in *Zurcher* is warranted.

In *Zurcher,* plaintiffs sought an award of attorney's fees kindled by a successful action for declaratory relief concerning constitutional rights. The court granted plaintiffs' motion for an award of reasonable fees. 366 F.Supp. 18 (N.D.Cal.1973). In a supplemental opinion, the court addressed several outstanding issues concerning the determination of a "reasonable" fee. Of particular relevance here is defendants' contention that time expended on a motion for preliminary injunction, on which plaintiffs did not prevail, should not be included in the fee calculation. 64 F.R.D. at 684. The court's analysis of this argument and its resolution of the issue will be quoted at length, in light of its dispositive force under the prevailing law of this Circuit:

> Some federal court decisions reason that hours spent on the litigation of unsuccessful claims should be deducted from the number of hours upon which an attorneys' fee award is computed. However, several recent decisions, adopting a different tack, deny fees for clearly meritless claims but grant fees for legal work reasonably calculated to advance their client's interests. These decisions acknowledge that courts should not require attorneys (often working in new or changing areas of the law) to divine the exact parameters of the courts' willingness to grant relief. . . .

Plaintiffs' attorneys obviously were not manufacturing legal services in constructing their preliminary injunction motion. They did not secure the full, injunctive relief which they originally requested, but they did obtain a significant concession from defendants as a result of their motion. In the process, they substantially advanced their clients' interests. The court finds that the attorney time spent on this motion . . . should be counted in determining a proper award. 64 F.R.D. at 684.[9]

▉ From this survey of the prevailing doctrine in this area, several principles may be distilled. *First,* parties seeking an award of attorney's fees should receive compensation in the same manner that an attorney traditionally is compensated, for all time reasonably spent on a matter. S.Rep. No. 94–1011; *Jones v. Diamond, supra,* 636 F.2d at 1381. *Second,* in actions involving a number of different claims, some of them successful, others unsuccessful, the court is not required to divide the claims into artificial "issue parcels" for purposes of calculating the fee award. *Miller v. Carson, supra,* 628 F.2d at 348. *Third,* time spent on claims which ultimately were rejected should not be automatically discounted. *Jones v. Diamond, supra,* 636 F.2d at 1382. *Fourth,* in such actions, the court should consider the relationship of the claims to each other, and the time spent preparing and litigating the "unsuccessful" claims *vis-a-vis* the effective presentation of the entire case. *Id. Hardy v. Porter, supra,* 613 F.2d at 114. *Fifth,* in complex civil rights litigation, issues will typically be intertwined, and the time spent on the issues will substantially overlap. *Jones v. Diamond, supra,* 636 F.2d at 1382. *Sixth,* in such actions, it may be impossible to divide the time spent on "successful" issues from time spent on "unsuccessful" issues. *Id.; Smith v. Fletcher, supra,* 559 F.2d at 1018,

---

**9.** The Senate Report also cites *Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444 (C.D.Cal.1974), as applying the "appropriate standards." S.Rep. 94–1011, at 6. In *Davis,* the court rejected the proportional fee doctrine, and held that counsel seeking an award of attorney's fees should receive remuneration "in the same manner that an attorney traditionally is compensated by a fee-paying client for all time reasonably expended on a matter." 8 E.P.D. at 5049.

n. 9; *United States v. Terminal Transport Co., supra,* 653 F.2d at 1020, n. 10. *Seventh,* if such division is impossible, and plaintiffs have prevailed on the greater part of their case, plaintiffs should be awarded fees for all time spent in good faith litigation of the entire action, including those claims on which plaintiffs did not prevail. *United States v. Terminal Transport Co., supra,* 653 F.2d at 1020, n. 10; *Jones v. Diamond, supra,* 636 F.2d at 1382. *Eighth,* in such intricate actions, only time spent pursuing claims which were plainly without merit and frivolous should be excluded from the calculation of the fee award. *Jones v. Diamond, supra,* 636 F.2d at 1382.

■ At the outset, it should be noted that the present action, beyond question, falls into the category of "complex Federal litigation." The Texas Department of Corrections is the largest prison system in the United States. More than 33,000 inmates are confined in twenty-two institutions, primarily scattered across the eastern half of the state. The present action was brought as a class action on behalf of all inmates. The action challenged a broad range of TDC policies and practices, as violative of the constitutional rights of inmates secured by the Eighth and Fourteenth Amendments. A survey of the relief secured by the plaintiff class indicates the breadth of the action. Trial consumed 159 days over a nine month period, during which 349 witnesses testified, and 1,565 exhibits were received into evidence. 503 F.Supp. at 1276.

Plaintiffs' entire case was directed at establishing two fundamental claims: that the conditions of confinement in TDC deprive inmates of rights secured by the Eighth Amendment of the United States Constitution, and that certain practices and procedures of TDC are violative of the Fourteenth Amendment. The vast amount of evidence adduced by plaintiffs related, in a variety of ways, to these two claims. In most instances, the testimony of individual witnesses covered a range of issues concerning life in TDC, to establish the various elements of plaintiffs' claims. The presentation of evidence by plaintiffs was not neatly divided by issue, for such an approach would have presented a false portrait of life in TDC. Nor was the investigation and preparation of this action susceptible to tidy division. By their nature, actions challenging the conditions of confinement in a state prison system involve a close and searching inquiry into the full range of conditions prevailing therein. In consideration of the vitality of the "totality of conditions" standard in Eighth Amendment litigation, the preparation and litigation of prison cases necessarily involve a thorough examination of all facets of prison life. Only in the light of such a full presentation may the claims of prisoners effectively be evaluated. Indeed, the Court of Appeals for the Fifth Circuit explicitly recognized this fact in its opinion in this action. *Ruiz,* 679 F.2d 1141–1142. ("We now consider TDC's challenges to [the district court's] findings that determine the totality of conditions caused by overcrowding in the presence of other conditions discussed, particularly the size of the security staff.") *See also* 503 F.Supp. at 1277. ("Each of [the challenged] areas will be considered separately, although many of the relevant factual and legal issues are applicable to several of the categories to be discussed.")

The present action involves a dramatic example of a case in which issues overlap to such a degree as to make it impossible to allocate the time spent by plaintiffs. Plaintiffs prevailed on virtually all issues raised during trial. As noted by the Court of Appeals, "many of the controverted issues, to which much of the trial testimony was devoted" were resolved in consent decrees. *Ruiz,* 679 F.2d at 1132. Most of the other issues raised in the course of trial were resolved in the injunctive decree, by specific reparative measures which were subsequently upheld on appeal or which were not challenged by defendants. *Id.,* at 1163–1164. Indeed, a careful analysis of the portions of the injunctive decree which were vacated on appeal reveals that *none* of those provisions may be traced to claims brought by plaintiffs in bad faith or frivo-

lously,[10] since all were well supported in the evidence by expert and lay testimony.

Defendants have argued strenuously that plaintiffs should not be awarded attorneys' fees for time spent on unsuccessful issues. Citations to cases from the Fifth Circuit are absent in this portion of their submission. Instead, they rely on *Sethy v. Alameda County Water District,* 602 F.2d 894 (9th Cir.1979), and *Nadeau v. Helgemoe,* 581 F.2d 275 (1st Cir.1978). As noted above, these cases have been explicitly rejected by the Court of Appeals for the Fifth Circuit in *Miller v. Carson, supra,* 628 F.2d at 348. Moreover, the language and logic of the controlling *en banc* decision of the Fifth

10. *Ruiz,* 679 F.2d at 1165, Section 11.5 of the opinion: Provisions of the District Court's Decree That Are Vacated:

11.5(1)—Parts I(A)(1) and I(A)(3)–(6), requiring that TDC take prescribed steps relating to the good time, parole, work furlough and inmate furlough programs, and to community corrections programs and facilities.

11.5(3)—Part IV(C)(3), prohibiting double-celling in administrative segregation cells that contain sixty square feet or less.

11.5(6)—Part VII, requiring that TDC comply with prescribed specifications and procedures before constructing either new units for housing inmates or new facilities at existing units.

11.5(7)—Part VIII, requiring that TDC reorganize the management of its correctional facilities.

These measures were adopted by the district court as part of the relief accorded the class to ameliorate the chronic overcrowding and understaffing of TDC, which was found to violate the Constitution. The Court of Appeals explicitly affirmed the findings of the district court with respect to overcrowding and staffing. *Ruiz,* 679 F.2d at 1142. Moreover, a substantial share of the relief from these unconstitutional conditions was affirmed. Additionally, defendants did not appeal from certain reparative measures. Finally, a substantial element of the relief ordered—the requirement of single-celling—is presently in limbo, as a result of the "wait and see" approach of the Court of Appeals. Therefore, it is beyond question that plaintiffs secured thorough relief from the conditions of overcrowding in TDC. The fact that the precise relief ordered by the district court, as an extension of its equitable powers, was "narrowed" by the Court of Appeals in no way undermines the fact that plaintiffs prevailed.

11.5(2)—Part III, requiring that TDC take various steps to improve the Huntsville Unit Hospital (HUH).

Before the Court of Appeals issued its opinion in this action, the parties reached an agreement on the continued operation of HUH. The "Stipulation and Order Modifying Decree—Huntsville Unit Hospital" was signed by all parties, and entered by the district court on February 15, 1982. As part of the stipulation, the parties agreed to advise the Court of Appeals that the issue had been resolved. Through oversight, this duty was not discharged, and the Court of Appeals was not apprised of the settlement. The parties thereafter filed a joint petition for rehearing on this issue. The petition was granted. Plaintiffs, therefore, have secured relief on *all* medical issues litigated in the case. *See Ruiz,* 1127 at n. 11, and Appendix A thereto, at pp. 1165–1167. (first consent decree-Health Care).

11.5(4)—Part V(J), requiring that inmates be permitted to help other inmates with the preparation of legal matters.

This part of the reparative injunction was vacated, because the rights it was designed to protect are adequately protected by an injunction entered in another case involving the Texas Department of Corrections, *Corpus v. Estelle,* 551 F.2d 68 (5th Cir.1977). *See Ruiz,* 679 F.2d at 1155. The decree in the present case was therefore modified to eliminate the perceived duplication. In all other respects, the portion of the injunctive decree concerning access to courts was affirmed. The presentation of evidence concerning inmates helping one another can not fairly be separated from the remainder of the evidence presented on the issue of access to courts. Nor is that particular claim rendered frivolous in the context of this action, merely because it was raised in another case.

11.5(5)—Part VI, requiring that TDC take various steps to improve fire safety and to comply with various Texas health and safety statutes.

This portion of the injunctive decree was vacated because the Court of Appeals ruled that the district court improperly considered pendent state law claims not raised by the complaints. The Court of Appeals, *sua sponte,* evaluated the constitutional claim concerning fire safety and health deficiencies and ruled in favor of defendants. However, the court explicitly recognized that the issue was intertwined with the overcrowding issue, and that the deficiencies demonstrated at trial might be relieved by the reparative measures adopted to cure overcrowding. *Ruiz,* 679 F.2d at 1159.

11.5(8)—Part IX(A), insofar as it prescribes reporting procedures pursuant to provisions of the district court's decree that are vacated in this opinion.

Plainly, vacation of this part of the injunctive decree does not affect the substantive rights of plaintiffs, as litigated at trial.

Circuit in *Jones v. Diamond, supra,* 636 F.2d at 1381–82, plainly disapprove the mechanical and superficial allure of the proportional recovery doctrine.

Defendants' legal assertions in this relation are, therefore, without merit. Nor have they advanced, in their brief, any substantive allegations concerning specific issues raised by plaintiffs at trial that might be considered "clearly without merit." *Jones v. Diamond, supra,* 636 F.2d at 1382. Defendants' pleadings present absolutely no basis in law or fact for their contention that this daedal and intertwined action should be artificially divided into "issue parcels." Indeed, such a division would do violence to the manner in which the case was prepared, litigated, adjudicated, and reviewed on appeal.

In the present action, plaintiffs presented a vast amount of evidence, on a wide variety of legal and factual claims. The work done investigating, preparing, and presenting this evidence necessarily must be viewed as a whole, and is not susceptible to tidy separation among discrete issues, which as already stated,[11] were largely affirmed on appeal. To the extent that the reparative injunction was not affirmed, it was narrowed, in an initial attempt to insure

that demonstrated constitutional infirmities be remedied in the manner least intrusive into the operations of the state prison system. The fact and extent of plaintiffs' prevalence on their claims was not disturbed on appeal. It may fairly be said that plaintiffs substantially prevailed on their entire case, as presented at trial.[12] Under the plain law of the Fifth Circuit, as expressed in the controlling *en banc* decision, and the clear legislative intent as well, plaintiffs are entitled to compensation for all time reasonably spent in preparation and litigation of this action.

### B. Documentation for time claimed

In most instances, plaintiffs have substantiated their time claims with contemporaneous time records, detailing with great specificity the amount of time spent on each day, and, often, the manner in which the time was spent. The accuracy and reliability of these time sheets is great; indeed, defendants have not specifically challenged a single hour claimed by plaintiffs, though they have had ample opportunity to do so. Instead, defendants have lodged a series of general attacks on the time claimed by plaintiffs, which will be addressed. However, it should be noted

11. This conclusion rests on a thorough evaluation of the time slips submitted by plaintiffs in support of their application for attorneys' fees, in light of the court's intimate familiarity with this action; the declaration of William Bennett Turner, Esquire, filed in support of the application. (Mr. Turner's credibility has been attested to frequently, and is beyond question.); and the twenty-two years' experience of the undersigned judge as a trial lawyer and his fourteen years on the trial bench. Cf. *Johnson v. Georgia Highway Express, supra,* 488 F.2d at 718. Defendants argue that the time summaries submitted by plaintiffs' counsel are inadequately detailed, and should have been divided among each issue on which each attorney worked. In support of this claim, they highlight the time summary of Joel Berger, Esquire. Three points should be noted about Mr. Berger's "model" time summary. First, in large part, the time summary is *not* divided by issues. Instead, the statement categorizes time spent on *e.g.,* "Fifth Circuit appeal", "Fifth Circuit Stay Application", etc. The only "issues" which are identified are "death row recreation" and "building tenders." Second, and more telling, Mr. Berger's total time claimed is 58.9 hours. This

amount is merely a fraction of the amount of time spent by plaintiffs' lead attorneys. Third, Mr. Berger assisted plaintiffs typically on specific issues, at the request of plaintiffs' lead attorneys. Accordingly, he could readily identify the issues to which he devoted time. Such simple identification could not readily be made by other attorneys, who were involved much more extensively in the litigation.

12. The only "issues" on which plaintiffs may be said not to have prevailed are the claims concerning fire and health standards. In the judgment of the Court of Appeals for the Fifth Circuit, these issues were improperly resolved by the district court on the basis of state law. The Court of Appeals then undertook to resolve the constitutional claims in these areas, though the district court had not reached those claims. The Court of Appeals ruled against the plaintiffs. However, it is plain from the language of the appellate opinion that the Court of Appeals viewed the factual issues raised by these claims as thoroughly intertwined with the remainder of plaintiffs' case. *See* note 10, *supra.*

that plaintiffs have amply carried their primary burden of documenting, with reasonable specificity, the time spent on this action.

The Court of Appeals for the Fifth Circuit has not provided a precise delineation of the standard of documentation which is required in establishing the "time and labor required." A survey of cases awarding attorney's fees will provide a framework of reference, if not a precise standard. *Infra.* In this relation, defendants place great reliance on a recent opinion by the Court of Appeals for the District of Columbia, which, in the view of defendants, sets forth a burden of proof which plaintiffs have wholly failed to meet. A review of what that court actually said, in its recent holding on attorney's fees, reveals that plaintiffs in the instant case have presented an almost paradigmatic example of proper documentation in support of a claim for fees.

In *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319 (D.C.Cir.1982), the court undertook to provide "further definition of the obligation of attorney fee applicants in documenting their claims." 675 F.2d at 1324. Among other matters, the court specifically addressed the degree to which counsel must document the "hours logged and work done." *Id.* at 1326. The court stated:

> Attorneys who anticipate making a fee application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney . . . .
>
> [I]t is insufficient to provide the District Court with broad summaries of work done and hours logged. [In another case, we have] recognized that the fee application need not present "the exact number of minutes spent nor the precise activity to which each hour was devoted . . . ."
>
> . . . The better practice is to prepare detailed summaries based on contemporaneous time records indicating the work performed by each attorney for whom fees are sought. In any event, once the reasonableness of the hours claimed becomes an issue, the applicant should voluntarily make his time charges available for inspection by the District Court or opposing counsel on request.

*Id.,* at 1326–27 (citations omitted). Plaintiffs have plainly met the criteria set forth in *Concerned Veterans.* Plaintiffs' lead attorneys have maintained contemporaneous, standardized time records which specify the amount of time spent, in six minute intervals, and which provide information about the nature of the time spent. Even before the defendants challenged the motion for attorneys' fees, plaintiffs voluntarily provided defendants with the time slips on which their claim would be based. Defendants have been in possession of those slips for many months and have filed no objections to the hours set forth therein.

The court in *Concerned Veterans* disapproved "[c]asual after-the-fact estimates of time expended on a case", as a basis for a fee calculation. *Id.* at 1326. *See also In re Hudson & Manhattan R.R. Co.,* 339 F.2d 114, 115 (2nd Cir.1964) ("There is no excuse for an established law firm to rely on estimates made on the eve of payment and almost entirely unsupported by daily records."). Defendants have relied heavily on *Concerned Veterans* and *In re Hudson* for their general challenge to the adequacy of plaintiffs' recordkeeping. While cases properly reject the notion that casual time estimates and broad summaries may form the basis for a fee award, the present application relies on neither estimates nor summaries. Rather, it is thoroughly detailed and documented by contemporaneous records. Of the total hours claimed by plaintiffs, 91.3% are documented by contemporaneous time slips or computer records, copies of which were actually submitted with the application for attorneys' fees.[13] An addi-

13. Contemporaneous time records, in the form of time slips and computer records of billing records, have been submitted for all of the time claimed by William Bennett Turner (except for 139.3 hours), Donna Brorby, Stanley A. Bass, Alvin Bronstein, Samuel Biscoe, Gail Saliterman, the firm of McCutcheon, Doyle, *et al.,* Katherine Crocker, Stephen Yoken, and law clerks associated with the firm of Turner and Sandmann. The hours represented by these combined claims total 7,484.05. Total hours claimed by plaintiffs in the present application

tional 6.1% of the hours claimed are based on affidavits, in which counsel state that their exhibits supporting the hours claimed are based on contemporaneous time records.[14] Defendants have not requested plaintiffs to provide the supporting records. Finally, only 2.6% of the hours claimed are based on estimates.[15] Nearly all of these estimated hours are claimed by William Bennett Turner, on his own behalf or on behalf of others associated with his firm. His estimates are to be accorded the highest presumption of validity, and will be accepted in the absence of any substantive challenge by defendants. *See, e.g., Cruz v. Beto,* 453 F.Supp. 905 (S.D.Tex.1977), *affirmed* 603 F.2d 1178 (5th Cir.1979); *Hedrick v. Hercules, Inc.,* 658 F.2d 1088, 1097 (5th Cir.1981). Plaintiffs have submitted sufficiently detailed documentation to permit the court to review the time claimed to determine its reasonableness.

C. Reasonableness of the time claimed

The Court of Appeals for the Fifth Circuit, in its seminal opinion in *Johnson v. Georgia Highway Express, supra,* stated that "[t]he trial judge should weigh the hours claimed against his own knowledge, experience and expertise of the time required to complete similar activities." 488 F.2d at 717. *See, e.g., Cruz v. Beto, supra,* 453 F.Supp. at 906, 908. It seems axiomatic that the familiarity of the court with the particular case in question is the most valuable and probative frame of reference, within which the reasonableness of time claimed by a party seeking an award of attorney's fees should be analyzed. From its special vantage point, the court can assess the nature of the litigation, the manner in which the factual and legal issues were presented at trial, the written submissions filed by counsel, and other elements of the litigation with which the court is intimately familiar.

In the field of prison litigation, the present action is unprecedented in its scope and complexity. Therefore, it may not readily be compared to other actions, to evaluate the reasonableness of the time claimed by plaintiffs. Rather than search for analogies of limited application, a better course would be to compare the amount of time expended by plaintiffs' counsel with that expended by defendants' counsel.

Plaintiffs have suggested a comparison of this nature, and have provided a substantial amount of information reflecting the amount of time defendants' myriad lawyers have spent litigating the various phases of this action. Defendants argue strenuously against the suggested comparison. Defendants' contentions notwithstanding, the value of information concerning time spent by defendants' counsel seems clear. By definition, the parties involved were litigating the same issues. The time spent by defendants' attorneys in defending an action necessarily relates to the time spent by plaintiffs, though the relation is obviously imprecise, and may be governed by a variety of factors. Federal courts have repeatedly noted the value of information concerning the defendants' counsel's time expenditure, in assessing the reasonableness of time claimed by plaintiffs. *See, e.g., Chrapliwy v. Uniroyal Inc.,* 670 F.2d 760 (7th Cir.1981); *Swann v. Charlotte-Mecklenburg Board of Education,* 66 F.R.D. 483, 485 (W.D.N.C. 1975). Though an assumption of precise congruity between the amounts of time spent by the two parties would obviously not be warranted, the value of the comparison cannot reasonably be assailed.

In litigating this action, defendants have employed the services of fifty-six lawyers, forty-six paralegals, and an untold number of legal assistants. Twenty-four of the lawyers involved have been employed by the Attorney General of Texas; for these

---

is 8,198.65. *See* Exhibit T to Declaration of William Bennett Turner.

**14.** The time claims falling within this category are those of Steven Winter, Joel Berger, and John Jordan.

**15.** The estimated time, totaling 214.3 hours, is claimed mostly by William Bennett Turner. Additionally, Frank Alvarez's claim for seventy-five hours is based on an estimation, according to his affidavit.

attorneys, no accurate time summaries have been kept. However, from answers to interrogatories, it appears that *at least* seven or eight assistant attorneys general have devoted substantially their entire work time to litigation of this action. If six attorneys work twenty hours per week for fifty weeks, 6,000 total hours would be expended. Thus, using these extremely conservative figures,[16] the amount of time spent by the staff of the Attorney General *in one year* approaches the total amount of time claimed by plaintiffs' attorneys for work extending over an eight year period.

To assist in prosecuting the appeal of this action, the State of Texas retained outside, private counsel. From July 1981, through January 1982, attorneys employed by this private firm spent 6,268.5 hours on this action; during the same period of time, their paralegals devoted 795.5 hours to the case.[17] Thus, in *seven months,* private attorneys working in addition to counsel employed by the state, logged nearly as many hours on this action as did plaintiffs' counsel in eight years.

Defendants have raised two arguments against the use of these figures as a basis for comparison in the present matter. *First,* defendants argue that *any* comparison of this nature is intrinsically specious. In support of this claim, defendants rely on *Mirabel v. General Motors Acceptance Corporation,* 576 F.2d 729 (7th Cir.1978); and *Samuel v. University of Pittsburgh,* 80 F.R.D. 293 (W.D.Pa.1978). The matters set forth in *Mirabel* and reiterated in *Samuel* are worthy of consideration, but only confute the legitimacy of the comparison, if it is applicable to this particular action. The

court in *Mirabel* noted that a given case might have a greater precedential value for one side than the other; additionally, it stated that:

> [A] plaintiff's attorney, by pressing questionable claims and refusing to settle except on outrageous terms, could force a defendant to incur substantial fees which he later uses as a basis for his own fee claim.

576 F.2d at 731; quoted in *Samuel,* 80 F.R.D. at 294. Were either of these factors applicable here, the value of the comparison between time spent by the two sides would be undermined. However, there is absolutely no indication that this action involved greater precedential value for one side than the other, and it is wholly unwarrantable to argue that plaintiffs' attorneys have lodged questionable claims or refused to settle on reasonable terms. Indeed, the history of this action has involved a number of occasions on which plaintiffs' counsel have continually pressed for extra-judicial resolution, only to be rebuffed by defendants. To the extent that it relies on the reasoning set forth in *Mirabel,* the *Samuel* decision is reasonable, though not applicable. To the degree the court in *Samuel* went beyond the *Mirabel* court in evaluating the merits of the time comparison, its reasoning and conclusion is wholly rejected.[18]

*Second,* defendants argue that the comparison is especially inapposite in the present action, on the grounds that the plaintiffs' attorneys are more knowledgeable than defendants' counsel concerning the substantive law of prisoner's rights, and that defendants' counsel were, additionally,

---

**16.** It appears from the records of the Attorney General that, in estimating the *expense* of litigation in his case, the computation was based on an allocation of 80% to 100% of the time of the attorneys assigned to this action. Assuming the accuracy of this estimation, the use of a standard of twenty hours per week seems conservative.

**17.** Answers to Interrogatories Numbers 6 and 7.

**18.** As a sampling of the somewhat asymmetric analysis of the *Samuel* court, the following matters are set forth as factors which, in that

court's view, demand a greater expenditure of effort by defense counsel than by plaintiff's counsel: (a) the need to travel to a client's office to interview individuals before filing an answer; (b) the need to review the applicable law; (c) the need to collect exhibits from the client; (d) numerous telephone calls; (e) the need to prepare for depositions. 80 F.R.D. at 294–95. Though, to be sure, all of the matters enumerated require an expenditure of time, it would seem that plaintiffs' counsel incur these demands on their time equally with counsel for defendants.

required to respond to the claim of the plaintiff-intervenor. These claims have facial merit, yet they would only be dispositive if the comparison were being relied on in a formulaic manner. It is a simple fact that the amount of time spent by defendants' numerous attorneys dwarfs the time spent by plaintiffs' counsel. Defendants' point to the participation of the government as a factor to be considered in this matter; yet, this factor supports, rather than undermines, plaintiffs' claim for fees. As in *U.S. v. Terminal Transports, Inc., supra,* the court is satisfied that counsel for private plaintiffs have diligently avoided duplication of effort. Thus, the presence of the United States in this action, and the consequent diminution of time required of plaintiffs' attorneys, actually saves defendants a great deal of money on attorneys' fees. 653 F.2d at 1021.

▮ Defendants have utterly failed to identify any individual hour, or block of time, which should be rejected, whether for alleged overlapping of services, wasteful expenditure of time, inaccurate recordkeeping, pursuit of frivolous issues, or the use of overqualified personnel for relatively menial tasks.[19] Nor have defendants advanced any specific argument in support of their assertion that litigation of this action was comparatively simple for plaintiffs, in relation to their claims against the defendants. (*See infra,* section VI(2): Novelty and Difficulty of the Questions.) Defendants cannot carry their argument, merely by making the flat assertion that plaintiffs have failed to meet their burden of proof. Indeed, as noted previously, under the standards set forth in *Concerned Veterans,* plaintiffs have amply carried their burden of presenting specific documentation of the hours claimed. As noted by Judge Tamm in his concurring opinion in *Concerned Veterans:*

> The [fee] application meets this burden by submitting an application accompanied by ... sufficiently detailed supporting

documentation. The burden of proceeding then shifts to the party opposing the fee award, who must submit facts and detailed affidavits to show why the applicant's request should be reduced or denied. Just as the applicant cannot submit a conclusory application, an opposing party does not meet his burden merely by asserting broad challenges to the application. It is not enough for an opposing party simply to state, for example, that the hours claimed are excessive. . . .

675 F.2d at 1338.

On the basis of a thorough review of the time records and summaries submitted in support of the application, and also in the light of the court's deep familiarity with this action, the conclusion is inescapable that the amount of time claimed by plaintiffs is entirely reasonable.

In cases of this complexity, involving the efforts of a number of attorneys at different stages and on different issues, the possibility that a certain amount of time spent by one attorney may overlap with the time spent by another attorney. Obviously, plaintiffs' counsel are not to be blamed for this condition; however, defendants should not be made to pay for the overlap. The Court of Appeals for the Fifth Circuit recently addressed this problem in *Flowers v. Wiley,* 675 F.2d 704 (5th Cir.1982). In that case, the court concluded that there should be "no compensation for hours spent in duplicative activity." 675 F.2d at 705. Beyond this summary conclusion, the court did not illuminate the path leading to its conclusions concerning the presence of duplicative effort.

In actions of this nature, it is virtually impossible to detect with precision the exact hours which might be categorized as duplicative. In such situations, the Court of Appeals for the Sixth Circuit has "approved the arbitrary but essentially fair approach of simply deducting a small per-

---

19. *E.g.,* in her declaration accompanying the attorneys' fee application, Donna Brorby states: "I have not recorded a great deal of my time in this case. For example I have not recorded most of the time I have spent organizing files or performing other tasks that might not be considered strictly legal."

centage of the total hours [claimed] to eliminate duplication of services." *Northcross v. Board of Education, supra,* 611 F.2d at 636–37, citing *Oliver v. Kalamazoo Bd. of Education,* 576 F.2d 714 (6th Cir.1978). Accordingly, in view of the possibility that some of the efforts of counsel in this action have been duplicative, all time claimed will be reduced by five percent. *See* table number 1.

## 2. THE NOVELTY AND DIFFICULTY OF THE QUESTIONS

The statement that this action is complex is by now a truism. The practices and policies of the Texas Department of Corrections affect the lives of inmates at every turn. Those practices and policies, when viewed as a whole, create the "conditions of confinement" which were challenged in this action. Presenting testimony about those conditions, typically by inmates, is, in itself, a complicated and difficult process, because of the special problems associated with securing testimony about TDC from inmates within TDC's own confines.

The legal issues presented were also complex. Isolated issues raised in this action had been litigated previously, but the vast number of issues presented here was entirely novel. On appeal, defendants identified thirty-three separate issues demanding appellate review. Defendants now attempt to downplay the intricacy of this action, contending that plaintiffs have "confuse[d] size with complexity." This argument is without merit.

Defendants assert first that the central issue in the case—overcrowding—was neither novel nor complex, citing a case which was filed *after* the present action, and appellate review of which culminated in an opinion by the Supreme Court *after* the issuance of the injunctive order in this case. *Chapman v. Rhodes,* 434 F.Supp. 1007 (S.D. Ohio 1977), *affirmed* 624 F.2d 1099 (6th Cir.1980), *reversed,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Moreover, defendants' argument relies on a facile and improper generalization. If it is true to say that the central issue in this case is over-crowding, it is equally true to say that the central issue in a complex antitrust suit is "monopoly." At this level of generality, all the factual and legal nuances of a case which renders it truly complicated are overlooked. In other words, defendants' simple statement proves too much, and cannot be accorded legitimacy. The factual presentation made by plaintiffs in this action, on overcrowding and all the other issues implicated, was detailed and thorough. The legal claims raised involved a variety of issues, some of them wholly novel, others better established. In sum, it is beyond cavil that the action was complicated and unprecedented.

Defendants also raise the claim that plaintiffs' "undoubtedly" relied on "canned" legal work for presentation of the legal issues involved here. After lodging this claim, defendants then casually assert that "[i]t is plaintiffs' burden to disprove this possibility." Defendants have offered neither legal support nor any factual basis for this argument, and it will be wholly rejected. Plaintiffs' factual and legal presentation in this action was entirely directed to *this* action, and in no manner was it "canned" or generalized.

The broad relief secured by plaintiffs in this action, through consent decrees and injunctive decrees, should dramatically alter the conditions of confinement in TDC. The reparative measures adopted in this action are pathbreaking in several respects and, viewed in combination, are unprecedented in federal prison litigation. Thus, in assessing the fee award here, the complexity of the legal and factual issues which were raised and the novel nature of the relief secured should be acknowledged.

## 3. THE SKILL REQUISITE TO PERFORM THE LEGAL SERVICES PROPERLY

Evaluation of this criterion is properly within the purview of the court. As stated in *Johnson,* "[t]he trial judge should closely observe the attorney's work product, his preparation, and general ability before the court," in recognition of the judge's experi-

ence as an attorney and judge. 488 F.2d at 718.

In actions of this nature, involving issues of extensive scope and consuming a tremendous amount of time, during trial and afterwards, it is essential that testimony be presented cogently and thoroughly, and that all written submissions be condensed and succinct. Moreover, as noted above, adducing testimony in cases involving prison conditions involves special difficulties. Most of plaintiffs' witnesses were, at the time of their testimony, inmates within the control of defendants, a circumstance which created tension throughout the trial. *See Ruiz v. Estelle,* 550 F.2d 238 (5th Cir.1977) (per curiam) (*Ruiz II*). Even investigation of the case under these conditions requires skills of broad compass. After initial investigation of this action, the attorneys were required to distill a coherent case from the rough data, which had to be at once balanced, comprehensive, and concise. Plaintiffs' attorneys accomplished these difficult objectives in a commendable fashion.

 Defendants argue that, because of the allegedly insufficient detail of plaintiffs' counsel's time records, the possibility that plaintiffs "overlawyered" the action cannot be evaluated. In large measure, this concern has been addressed in Section VI(1), Time and Labor Required. Contrary to defendants' implication, plaintiffs are not required to assign, to any given task, the minimum amount of legal skill capable of accomplishing it. It is true that time spent by attorneys on non-legal work—*e.g.,* filing information, computing statistics, etc.—, is not properly compensable at attorney's rates, merely because an attorney may have performed it. *Johnson,* 488 F.2d at 717. Defendants confuse this principle with an assertion that has no grounding in *Johnson* or its progeny: that plaintiffs' counsel have an obligation to perform legal work in a minimally competent way. Such a claim is idle; indeed, were plaintiffs' counsel to have adhered to such a pernicious doctrine, they would have done a serious disservice to the interests of the plaintiff class. As in any complex federal litigation, plaintiffs have a right to expect from counsel the fullest possible effort, in the vigorous prosecution of the claims of the class.

In sum, there can be no doubt that this action demanded of all plaintiffs' counsel the most thorough of factual and legal investigation, painstaking preparation for every trial day over a long period of time, careful sifting of a great volume of evidence, and concise presentation of intricate legal arguments. The success of counsel in securing for the plaintiff class the broad relief outlined in this order attests to the capacity of counsel adequately to meet the challenges associated with actions of this nature.

### 4. THE PRECLUSION OF OTHER EMPLOYMENT BY THE ATTORNEY DUE TO ACCEPTANCE OF THE CASE

Litigation of this action has been the primary focus of the legal practice of plaintiffs' two lead attorneys. The vast amount of time which they have spent on this action, as well as the logistical difficulties involved in litigating a case in another state, have necessarily precluded their development of a full practice. Plaintiffs' lead counsel, William Bennett Turner, Esquire, enjoys an exemplary reputation as a competent, conscientious, and successful attorney. There can be little doubt that, had he not been involved in this action, he would have had an ample amount of legal work to consume his time. Turner's associate, Donna Brorby, Esquire, similarly would have been available to work on other matters, had her time not been almost exclusively devoted to this action for long periods during the course of this litigation.

Defendants raise the argument that consideration of the possible preclusive effect of this action on the legal practice of plaintiffs' counsel should not be considered, because this case provided a steady source of work for counsel. This argument is circuitous, and ignores the plain thrust of the *Johnson* criterion in this relation.

## 5. THE CUSTOMARY FEE

"The customary fee for similar work in the community should be considered." *Johnson, supra,* 488 F.2d at 718. The unique nature of this action renders evaluation of this criterion difficult. It simply is not possible to find a case in which "similar work" was done, and against which an evaluation of the proper fee in this case might be conducted. Therefore, by definition, it is also difficult to ascertain a "customary fee." Accordingly, this criterion cannot be applied with neat precision, on the basis of plain, probative evidence. Instead, the necessary determination must be made on the basis of a variety of relevant, though not dispositive, evidence.

### A. Similar Work

■ In an action for which no adequate parallel can be found, the best example of a fee paid for similar work is that paid by opposing counsel in the same action. As noted in *Brotherhood of Signalmen v. Southern Ry. Co.,* 380 F.2d 59 (4th Cir.1967),

[t]he standards employed in compensating attorneys for the opposing party in litigating the selfsame issue give some indication of the importance of the case and are a relevant consideration in fixing the fees.

380 F.2d at 69. The relevance of such information is beyond doubt. *Accord McPherson v. School District,* 465 F.Supp. 749 (S.D.Ill.1978); *Bradley v. School Board,* 53 F.R.D. 28, 44 (E.D.Va.1971); *Stastny v. Southern Bell,* 458 F.Supp. 314 (W.D.N.C. 1978); *Jordan v. North Carolina National Bank,* 399 F.Supp. 172 (W.D.N.C.1975); *Dependahl v. Falstaff Brewing Co.,* 653 F.2d 1208 (8th Cir.1981). The flaws of any precise analogy are clear; most importantly, there may be disparities in expertise in the particular area of law. In the present case, this point is of special relevance, since plaintiffs' lead attorney, and many of the other attorneys associated with the case, are among the most noted prisoners' rights advocates in the country. Defendants' retained counsel, although very able and competent, have demonstrated no special expertise in this field, nor is any disclosed upon a thorough examination of the professional summaries provided by defendant. As stated by the court in *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760 (7th Cir.1982),

[t]he court noted that defendant's attorneys billed the defendants at rates comparable to the hourly rates sought by the plaintiffs. Furthermore the court noted that the caliber of counsel for each side was equally matched. Both sides utilized the services of widely recognized attorneys.

670 F.2d at 767. In this action, the caliber of counsel was not equally matched, simply because of the demonstrated expertise of plaintiffs' counsel. An hour of time spent by a knowledgeable civil rights attorney, practicing in the precise area of his expertise, is plainly more valuable than an hour spent by a capable and dedicated attorney who, nonetheless, is working a field with which he has little familiarity.

The hourly fees paid to defendants' private counsel range from $125 to $165 per hour, for the time spent by partners, $75 to $110 per hour, for time spent by associates, and $35 per hour, for paralegal assistants.[20] The variation between hourly rates for partners and associates is customary, of course, though its rationale is less applicable in this action, since none of the partners involved have demonstrated any particular experience and expertise in the field of prisoners' rights. There is no indication that defendants charged different rates based on the manner in which the time was spent, *e.g.,* in court, out of court, conferences, or travel.

---

**20.** In addition to defendants' employment of a private law firm, at varying rates set forth here, defendants apparently entered into a contract for legal services with Professor Michael Sharlot of the University of Texas School of Law. Professor Sharlot's legal credentials have not been presented to the court, nor has his exper-tise in the field of prisoners' rights been demonstrated by defendants. This contract specifies that Professor Sharlot will be compensated at the rate of $125 per hour, regardless of how that time is spent. *See* Exhibit K to the Declaration of William Bennett Turner.

## B. In the Community

Plaintiffs have taken the deposition of Harry M. Reasoner, Esquire, a partner in the Houston-based law firm of Vinson & Elkins. Reasoner is a well respected attorney, who has had wide experience in complex federal litigation. He also has some knowledge of prisoners' rights litigation in federal court, having served as lead counsel in an important action of this type, *Guajardo v. Estelle,* 432 F.Supp. 1373 (S.D.Tex. 1977), *affirmed* 580 F.2d 748 (5th Cir.1978). Reasoner's deposition was taken, specifically, to adduce information concerning the prevailing rate for experienced attorneys litigating complex issues in federal court. According to him, the prevailing rates in the Houston area range from $50.00 per hour for beginning associates, to $250 per hour for "established senior lawyers." For persons of William Bennett Turner's experience, the applicable range, according to Reasoner, is from $175 to $250 per hour.[21]

Defendants have attempted to undermine the probative value of Reasoner's testimony, by setting forth in their written submission the rates Reasoner personally was awarded in the *Guajardo* case. The argument fails for several reasons. First, those rates are out of date. Contrary to defendants' assertion, *Guajardo* was *not* a contemporary of the present case. It was tried first in 1972, and later in 1976. The fees were awarded long before the present case was tried. Second, the rates awarded in that action were significantly lower than those typically charged by Reasoner, because he had failed to keep adequate records of time expended, and because he had initially accepted the case entirely without expectation of compensation. Third, the *Guajardo* case, though a critical advance-

ment in prisoners' rights, does not remotely approach the present case in complexity or difficulty, nor even in simple scope.[22]

## C. Toward a Customary Fee

Plaintiffs' lead attorney has been awarded attorney's fees in several prisoners' rights cases in Texas during the past several years. Evaluation of these rates is useful in determining an appropriate rate in the present action. In *Corpus v. Estelle,* No. 68–H–348 (S.D.Tex.1980), a settlement was reached on the matter of attorney's fees, whereby Turner was compensated at the rate of $100 per hour, for the time spent defending the appeal in that action concerning the issue of fees, a relatively simple issue. Earlier in the same action, Turner secured compensation at the rate of $90 per hour for trial work, and $75 per hour for out-of-court time, for all time spent from 1968 to 1977. Turner has secured basically these same rates in *Cruz v. Beto,* 453 F.Supp. 905 (S.D.Tex.1977) (for work between 1972 and 1976). In that action, the second award of fees was enhanced to account for inflation during the intervening years.

These rates provide at least a basis for assessing a proper fee rate in the present case. However, two things should be noted about their applicability. First, participating in those cases substantially enhanced the expertise of plaintiffs' lead counsel. They contributed in large part to the emergence of Turner as probably the leading practitioner in the field of prisoners' rights in the United States. Thus, Turner brought to the present case his experience in these previous cases. As noted above, in the discussion of rates charged by defend-

---

**21.** Reasoner testified that he did not know of any lawyers in the Houston area who possessed Turner's skill and expertise in cases of this kind. By way of demonstration, Reasoner explained that he had been unable to find anyone in Houston to whom he would feel comfortable delegating lead authority on the *Guajardo* case.

**22.** Nor is it probative that Reasoner did not charge a fee for his representation in another important case, *Rummell v. Estelle.* Reasoner,

by virtue of the nature of his practice, may have the capacity to accept *pro bono* work. He is to be commended for this effort. However, other attorneys, whose practice is more completely devoted to civil rights work, may not have that capacity. The express purpose of the Civil Rights Attorneys Fee Award Act is to ensure that such attorneys are not consigned to destitution by virtue of their commitment to civil rights litigation.

ants' retained counsel, the rates vary, even in the category of partners, to reflect the experience of the particular attorney. Therefore, though Turner was an experienced attorney at the time of those previous cases, he was in the lower range of that broad category. In contrast, during his work on the present case, he legitimately should be considered as probably the leading member of the bar in this field, and should be compensated accordingly.

■ Second, those rates are out of date, simply because of inflation, and also because of the long delay plaintiffs' counsel experiences in recovering fees in protracted actions such as this. *See, Copeland v. Marshall,* 641 F.2d 880, 893 (D.C.Cir.1980) (*en banc*) ("[P]ayment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable."). The most direct and manageable way of compensating plaintiffs' attorneys for the losses associated with diminished value of money because of inflation, and, additionally, the deprivation of the actual use of the money, is to award current rather than historical rates for all past work. As set out in *In re Ampicillin Antitrust Litigation,* 81 F.R.D. 395 (DDC 1978), the use of current rates, despite the fact that some of the services rendered were provided in the past, "simplifies the Court's task and roughly counterbalances the inflationary loss suffered by the attorneys because of the long delay in recovery of their fees." 81 F.R.D. 402. *Accord Chrapliwy v. Uniroyal, Inc., supra,* 670 F.2d at 764; *International Travel Arrangers Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1275 (8th Cir.1980); *Keith v. Volpe,* 86 F.R.D. 565, 577 (C.D.Cal.1980); *Mader v. Crowell,* 506 F.Supp. 484, 487 (M.D.Tenn.1981); *Gates v. Collier,* 616 F.2d 1268, 1276 (5th Cir.1980).

As noted above, the Court of Appeals for the Fifth Circuit, sitting *en banc,* has explicitly approved the language in the Senate Report relating to § 1988, to the effect that compensation in complex § 1983 actions should be governed by the same con-

siderations that relate to renumeration in "equally complex Federal litigation, such as antitrust cases." *Jones v. Diamond, supra,* 636 F.2d at 1381. The only evidence concerning customary fees in the Houston area for complex federal litigation that has been adduced in the present matter is the testimony of Harry Reasoner, stating that rates for experienced counsel range from $175 to $250 per hour. No reported cases in this area have been located; however, a number of opinions awarding fees in complex antitrust actions have been published. They are noted in Section VI(12), Awards in Similar Cases, *infra.*

### 6. WHETHER THE FEE IS FIXED OR CONTINGENT

In *Jones v. Diamond, supra,* the Court of Appeals for the Fifth Circuit, sitting *en banc,* stated:

> [B]ecause the fee in this case was contingent on success, it is appropriate for the court to consider *Johnson* criterion number six. . . . Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of the result. This is neither less nor more appropriate in civil rights litigation than in personal injury cases. The standard of compensation must enable counsel to accept apparently just causes without awaiting sure winners.

636 F.2d at 1382. *See, e.g., Flowers v. Wiley,* 675 F.2d 704 (5th Cir.1982) (approving a one-third contingency multiplier in a case in which "it [was] hardly conceivable that the plaintiffs could lose." 675 F.2d at 706). *Accord Schneider v. City of Atlanta,* 628 F.2d 915, 920 (5th Cir.1980); *Knighton v. Watkins,* 616 F.2d 795, 800–01 (5th Cir. 1980); *Wolf v. Frank,* 555 F.2d 1213, 1218 (5th Cir.1977); *Miller v. Mackey International, Inc.,* 515 F.2d 241, 243 (5th Cir.1975).

The precise manner in which the contingency of recovery is to be recognized and given allowance is not clear. It appears that the typical approach is the use of a multiplier. *See, e.g., Flowers v. Wiley, su-*

pra, 675 F.2d at 706. Either the hourly rate set by the court, or the "lodestar" determined to be reasonable on the basis of the various *Johnson* factors, is enhanced. This is accomplished by multiplying that amount by a factor designed to reflect adequate compensation for the uncertainty of recovery and to advance the interests set forth in *Jones v. Diamond, supra.* However, in this action, the preferable approach is to evaluate the propriety and size of the multiplier on the basis of factors warranting enhancement of the award, in addition to contingency, in the course of considering the *Johnson* criteria. Therefore, final resolution of the multiplier question will be deferred until completion of the *Johnson* inquiry.

It is sufficient to note here that recovery of fees by plaintiffs was entirely contingent on success on the merits. Indeed, plaintiffs were only assured of recovery when the Court of Appeals handed down its ruling on June 23, 1982, ten years after the action was filed. Defendants argue in their brief that "should a sufficient number of the [District] Court's conclusions be reversed, plaintiffs may indeed not be 'prevailing' parties' entitled to attorney's fees under § 1988." This argument is legally incorrect, because of the vast amount of relief secured by consent decrees which were not subject to reversal on appeal. However, as set forth above, the *amount* of fees was contingent on the disposition of the appeal in this action. Moreover, the first consent decrees, and the corollary assurance gained that plaintiffs would be in some respects "prevailing parties," was not entered until March 1980, nearly eight years after the action was initiated. Simply put, it is beyond question that plaintiffs' recovery of attorneys' fees in this action was heavily contingent. Defendants' argument to the contrary views the matter wholly from the present posture of the action, and fails to account for the history of the case.

## 7. TIME LIMITATIONS IMPOSED BY THE CLIENT OR THE CIRCUMSTANCES

"Priority work that delays the lawyer's other legal work is entitled to some premi-um." *Johnson,* 488 F.2d at 718. Litigation of this action has involved a substantial amount of priority work. Most importantly, trial of the action consumed nine months. By definition, that time involves work of the utmost priority, involving long days in the courtroom and evenings devoted to review and preparation. Additionally, plaintiffs' counsel obtained several preliminary injunctive orders, on behalf of the class, which typically involved urgent matters relating to protection of the class from harassment. *See, Ruiz v. Estelle,* 550 F.2d 238 (5th Cir.1977) (per curiam) (*Ruiz II*). More recently, during the course of negotiations leading to the second consent decree, plaintiffs' counsel were required to meet strict time deadlines, which, in view of the gravity of the matters under discussion, required a vast amount of work. In all instances, plaintiffs' attorneys have met the time demands.

## 8. THE AMOUNT INVOLVED AND THE RESULTS OBTAINED

Constitutional rights are not, of course, confined to those available at modest cost. The very concept of federalism, the division of powers among the branches of the federal government, and the nature of the safeguards imposed by the Bill of Rights and the fourteenth amendment levy costs impossible for an accountant to calculate, but esteemed by us because they are literally priceless.

*Ruiz v. Estelle,* 679 F.2d at 1146. The results obtained in this action are simply not susceptible to calculation on the basis of monetary value. As a result of this action, more than 33,000 inmates of the Texas Department of Corrections have been granted relief from a broad pattern of unconstitutional practices and procedures. Their "priceless" constitutional rights have been defended and vindicated.

In evaluating the propriety of certain remedies included in the reparative injunction, the Court of Appeals conducted a limited form of "cost-benefit" analysis to de-

termine whether certain remedies were warranted by the scope of the demonstrated constitutional violation. *Ruiz,* 679 F.2d at 1146–1147. Certain measures were vacated, without prejudice, because of the immense cost associated with the remedies and the lack of proof that these particular measures were required to cure the particular constitutional deficiencies.

By plain implication, then, those measures which have been affirmed, or which were taken by the state as necessary and proper, *do* yield some probative data about the "amount involved and the results obtained." Defendants have estimated that the relief ordered in this action might cost as much as $4,000,000,000. *See* Exhibit G to Declaration of William Bennett Turner (Answers of Defendants to Plaintiffs' Interrogatories). No new estimate, based on the appellate decision, is available. In that decision, the Court of Appeals struck down remedies which might cost the state a total of $330,000,000. Therefore, based on defendants' estimates, and allowing for enormous exaggeration, well over $1,000,000,000 will be required to repair the constitutional deficiencies demonstrated by measures that were not reversed on appeal.

However, it must be stressed that this mention of the monetary sums associated with the relief granted in this case is included only as a peripheral point of reference. As already mentioned, the Court of Appeals for the Fifth Circuit has explicitly approved the legislative history of § 1988, stating that "the amount of fees awarded under [1988 should] ... not be reduced because the rights involved may be nonpecuniary in nature." *Jones v. Diamond, supra,* 636 F.2d at 1381–82, quoting S.Rep. 94–1011, at p. 6. By any proper assessment, the results obtained in this action are vast. *See* review of relief secured by plaintiffs, *supra.*

## 9. THE EXPERIENCE, REPUTATION AND ABILITY OF THE ATTORNEYS

Plaintiffs' lead attorney in this action, William Bennett Turner, is probably the foremost practitioner in the field of prisoners' rights in this nation, which has been alluded to several times in this opinion. His experience, reputation, and ability are of the highest caliber, and he has devoted a substantial amount of his professional career to representing prisoners in actions seeking vindication of constitutional rights. In that field, his abilities are unparalleled. See *Cruz v. Beto, supra,* 453 F.Supp. at 910. *See also* Deposition of Harry Reasoner, at 30.

His associate, Donna Brorby, was, at the start of her participation in this action, a recent law graduate. However, in the course of this litigation, she developed and demonstrated proficiency and talent as an advocate. As stated in *Johnson,* "[l]ongevity, *per se* should not dictate the higher fee. If a young attorney demonstrates the skill and ability, he should not be penalized for only recently being admitted to the bar." 488 F.2d at 719.

Many of the remaining attorneys who have participated in this litigation on behalf of plaintiffs are among the leading practitioners in the field. Messrs. Stanley Bass, Steven Winter, Joel Berger, and Alvin Bronstein rank in the vanguard of prisoners' rights attorneys. Each is accomplished and proficient in the field of prison law, and, on the basis of his demonstrated ability in numerous cases, has developed a reputation commensurate to his skill and experience.

## 10. THE UNDESIRABILITY OF THE CASE

From the outset of this litigation, it was obvious that this action would involve massive expenditures of time by plaintiffs' counsel. During much of this time, the attorneys for the plaintiffs operated under difficult and distressing circumstances. Moreover, the possibility that the time expended would be uncompensated was always present. Those facts alone made the case undesirable in many respects. Additionally, it is undisputed that litigation involving prisoners' rights is seldom actively sought, nor is it prestigious in traditional legal circles. Locating counsel of sufficient skill to litigate cases of this nature under

these conditions is, therefore, quite difficult. *See* Declaration of William Bennett Turner, ¶ 3; Deposition of Harry Reasoner (inability of each attorney to find counsel to assist in prison litigation). The fact that plaintiffs' lead counsel, and several other attorneys associated with the case, have developed national reputations in this field in no manner undermines the undesirability of the work, particularly in view of the general stigma attached to such actions, their difficult nature, and the particular formidability and hazards associated with the case at hand.

### 11. NATURE AND LENGTH OF THE PROFESSIONAL RELATIONSHIP WITH THE CLIENT

The meaning of this criterion and its effect on the calculation of a "reasonable" fee has always been unclear. Courts applying to *Johnson* factors typically state simply that this particular standard is irrelevant or immaterial. *See, e.g., Morrow v. Winter,* 519 F.2d 1337 (S.D.Miss.1981). It would seem that an ongoing relationship between the client and the attorney would diminish to some degree the claim for a sizeable fee, because of the prospect of future, income-producing legal work on behalf of the client or the possibility that the legal work was done as a gratuity. If this speculation is accurate, then the present application for fees should not be discounted because of this factor.[23] However, it must be acknowledged that this analysis is purely conjectural, and without foundation in the law of this Circuit. In any event, the fee award in this action will be neither increased nor diminished because of this criterion.

### 12. AWARDS IN SIMILAR CASES

As set forth in several places above, this action is extraordinary and defies compari-son with other cases, for purposes of assessing a fee award. Certainly, no previous civil rights action involving the vindication of prisoners' rights has been litigated to the extent shown by the record in this case. Accordingly, the best analogy, and one sanctioned explicitly by Congress and the Court of Appeals for the Fifth Circuit, is to "equally complex Federal litigation, such as antitrust cases." *Jones v. Diamond, supra,* 636 F.2d at 1382. The following attorneys' fee awards are noted, therefore, as a frame of reference:

*In re Folding Carton Antitrust Litigation,* 84 F.R.D. 245, 265 (N.D.Ill.1979): $150 per hour for attorneys serving in crucial capacity on plaintiffs' "Executive Committee"; $125 per hour and $75 per hour for attorneys playing less important roles.

*Arenson v. Board of Trade of City of Chicago,* 372 F.Supp. 1349 (N.D.Ill.1974): Base award of $125 per hour. The base fee was multiplied by a contingency factor of four "to adequately compensate [the attorneys] for initiating this significant litigation and negotiating such a beneficial settlement for the class." Total fees: $1,339,060. Average rate per hour: $358.56.

*Bray v. Safeway Stores, Inc.,* 392 F.Supp. 851 (N.D.Cal.1975): Award of between $400 and $428 per hour, for 7,462–8,000 hours. Total award: $3,200,000.

*In re Coordinated Proceedings in Antibiotic Antitrust Actions,* 410 F.Supp. 680 (D.Minn.1975): Rate of $200 per hour for settlement negotiations, enhanced by contingency factor of two or two and one-half. Total award: $9,288,723.

*In re Gypsum Cases,* 386 F.Supp. 959 (N.D.Cal.1974): $300 per hour for lead counsel. Total fee award: $9,262,559.

---

**23.** Defendants' interpretation of this criterion renders it essentially meaningless. They argue in their brief that "plaintiffs' counsel certainly has nurtured a relationship with the amorphous prisoner population of the country and other civil rights plaintiffs, undoubtedly hopeful that future fee-paying clients or fee awards cases will come their way as a result of participation in this case for similar clients." The use of conflicting terms of reference in this sen-tence (*i.e.,* "has" and "their") makes it unclear whether defendants are referring only to one attorney, or to a group of plaintiffs' attorneys. In any event, the argument is idle. Similarly, it could be argued that *any* attorney might, through developing a reputation as an effective advocate, develop future business. Plainly, this *possibility* of future business is not the topic contemplated by the criterion under discussion.

Contingency factor of three, to promote private enforcement of antitrust laws.

*Oppenlander v. Standard Oil Company,* 64 F.R.D. 597, 613 (N.D.Cal.1974): $190 per hour for "total lawyers time", without differentiation for experience. Total award: $1,548,000.

Additionally, the following cases in the field of civil rights are noted:

*Hedrick v. Hercules, Inc.,* 658 F.2d 1088 (5th Cir.1981): $120 per hour for a relatively simple age discrimination action brought on behalf of one plaintiff.

*Neely v. City of Granada,* 624 F.2d 547 (5th Cir.1980): $100 per hour in routine Title VII action litigated under clearly established law, with no apparent factual intricacies.

Finally, the awards to plaintiffs' lead counsel, noted in Section VI(5) above, are considered as appropriate awards for lesser experienced counsel, to be augmented in view of the inflation of intervening years.

*Rajender v. University of Minnesota,* 546 F.Supp. 158 (D.C.Minn.1982), $125 per hour awarded to lead firm in Title VII case, multiplied by three to reflect the contingent nature of the case and the quality of the work.

## VII.

The foregoing consideration of the *Johnson* criteria for evaluation of attorneys' fee awards leads to the firm conclusion that plaintiffs are entitled to a substantial award of attorneys' fees. Not one of the factors set forth compromises or confutes the claim for fees. A number of criteria support an upward adjustment of the amount of the total award. The facts supporting this conclusion are contained in the foregoing discussion. It should be reiterated that this action was exceedingly complicated and demanded a great amount of skill at all stages. Often, the work was of the highest priority, and created stringent demands on the time of plaintiffs' attorneys. On all occasions, plaintiffs' counsel performed with admirable ability, under often straitened circumstances. A measure of the ability and perseverance demonstrated by plaintiffs' counsel is the broad relief secured on behalf of the plaintiff class. The results obtained are "priceless". Finally, plaintiffs' attorneys sustained this commendable effort, through ten years of litigation, without any assurance that their efforts would be compensated.

On the basis of these considerations, it seems eminently reasonable to enhance the award of attorneys' fees by use of a multiplier by two. Use of this multiplier is consonant with the conclusions of other courts which have enhanced fee awards, in recognition of the extreme contingency of recovery, the significant benefits conferred on the plaintiff class, the extent to which plaintiffs have privately enforced crucial social objectives which might otherwise be ignored, and the general risk associated with initiating such complex litigation. *See* cases cited in Section VI(12), *above.*

The fees awarded to plaintiffs are set forth in Table I. The hours used in that calculation are based on the time claimed in plaintiffs' application, and evaluated in Section VI(1), *supra.* The hourly rates on which the fee award is based have been based on the foregoing discussion of the *Johnson* criteria, with special attention to "the customary fee," "the experience, reputation and ability of the attorney" and "awards in similar cases." The attorneys will be compensated at the following rates.

1. Plaintiffs' Lead Counsel: $150.00 per hour. William Bennett Turner is entitled to compensation at a level commensurate to his status as the foremost practitioner in this field. In addition to his preeminent ability and the dedication which Turner contributed to this action, he also served as lead counsel, coordinating a complicated course of investigation, preparation, litigation, and appeal. Because of his superordinate role, he is entitled to compensation at a rate above that applicable to comparably experienced and skilled attorneys. By way of analogy, it is noted that the attorney who coordinated antibiotic litigation was compensated at a rate of $300 per hour, in 1975. *See* 410 F.Supp. at 693–94.

2. Experienced Attorneys: $125 per hour. Stanley A. Bass, Joel Berger, and Alvin Bronstein will be compensated at this rate.

3. Intermediate Attorneys: $100 per hour. Donna Brorby, Steven Winter, and Samuel Biscoe will be compensated at this rate.

4. Inexperienced or Subordinate Attorneys: $75 per hour. Frank Alvarez, John Jordan, Gail Saliterman, Katherine Crocker, and Stephen Yoken will be compensated at this rate.

5. Composite time of McCutcheon, Doyle, Brown & Emerson: Because of the billing practices of this firm during the relevant time, the total number of hours charged by the firm will be compensated at a composite rate of $40 per hour.

6. The time of paralegals and law clerks will be compensated at the rate of $25 per hour.

The award is collectible against the Treasury of the State of Texas. *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Plaintiffs have suggested that one-half of the award be payable instantly, and the remainder payable upon final disposition of this action. The merits of this proposal are plain. However, defendants will be given fifteen days from receipt of this order in which to submit an alternative proposal for payment of the fees set forth in this order.

## VIII.

■ Plaintiffs are also entitled to recover their costs. This sum should include court costs, and all reasonable expenses involved in the litigation, including travel expenses. *Jones v. Diamond, supra,* 636 F.2d at 1382; *see, e.g., Cruz v. Beto, supra,* 453 F.Supp. at 911. Expenses of plaintiffs' counsel in this action are entirely reasonable, in view of its length and difficulty. The sum of $51,844.48 shall be recoverable

from defendants as plaintiffs' reasonable expenses.[24] It is noted that the disbursements of defendants' retained counsel (whose main offices are in Houston) during the first seven months of their involvement in this action, greatly exceed those of plaintiffs' counsel for over a course of ten years.

## IX.

■ Plaintiffs are clearly entitled to attorneys' fees for time expended in insuring implementation of the relief secured. *Miller v. Carson,* 628 F.2d 346 (5th Cir.1980). It is now plain that plaintiffs are "prevailing parties", and that they are entitled to attorneys' fees for time spent in the litigation. Those basic facts will not change. In recognition of this, Section X of the injunctive decree provided that plaintiffs could file "later applications for services rendered by their counsel in implementing the relief specified in this decree and the consent decree agreed to by the party, and for further services in this action."

The amount of time claimed on such future applications might be disputed, but the basic entitlement to fees for time reasonably expended is unquestioned on the basis of the appellate disposition of this action. In view of this fact, it is desirable to establish a process by which future applications for attorneys' fees may be resolved expeditiously. More importantly, in light of the history of reluctance on the part of defendants to pay *any* attorneys' fees, the court has an interest in insuring that its decrees are promptly obeyed by all parties. In the presence of a similar problem, the Court of Appeals for the Fifth Circuit has approved the creation of a fund, out of which further costs and fees might be awarded. *Miller v. Carson, supra,* 628 F.2d at 349. Creation of such a fund will provide assurance that plaintiffs' efforts to secure compliance with the injunctions in this action will be compensated, and that they will not have to

---

24. The expense for which plaintiffs seek reimbursement are for the most part documented by receipts and bills. Plaintiffs' lead attorney has stated that he has offered to make these receipts available to defendants for inspection.

Defendants have not contested the fact of this offer, nor have they requested the opportunity to examine the documents. In view of this failure, the total requested by plaintiffs will be accepted as accurate.

endure interminable delays in securing such remuneration. The interest on any money deposited in this fund should obviously accrue to defendants.

When seeking future attorneys' fees, plaintiffs should file a motion for their award, as is present procedure for attorneys' fees pursuant to § 1988. Defendants shall be provided the opportunity to respond fully to such applications. Only in the event that the court determines that plaintiffs are entitled to the fees sought will an order issue, directing payment of those fees directly from the fund previously mentioned.

## X.

The total amount of fees awarded herein is substantial. However, it is modest in comparison with the expenditures of defendants on attorneys' fees, the awards of attorneys' fees granted in other complex federal litigation (see Section VI(12)), and the vast benefits secured by the class plaintiffs in this action. Accordingly, it is

ORDERED that plaintiffs' motion for an award of attorneys' fees and costs is hereby GRANTED. It is further

ORDERED that defendants, in their official capacities, shall pay to plaintiffs the attorneys' fees set forth in Table 1 of this order, pursuant to a payment plan to be established as provided for herein. It is further

ORDERED that defendants, in their official capacities, shall pay to plaintiffs the costs incurred in this action, as set forth in Table 2 of this order. It is further

ORDERED that defendants, in their official capacities, shall pay to plaintiffs interest on the monies due in this order, to accrue at the rate currently applicable to United States Treasury Bills. The interest shall begin accumulating as of the date of this order. It is further

ORDERED that defendants shall deposit with the Clerk of the Court the sum of One Hundred Thousand Dollars ($100,000), pursuant to Section IX of this order.

### TABLE I

| ATTORNEY | HOURS [25] | RATE | BASE AWARD | TOTAL [26] AWARD |
|---|---|---|---|---|
| William Bennett Turner | 2,342.6 | $150 | $351,390.00 | $ 702,780.00 |
| Donna Brorby | 3,391.0 | 100 | 339,100.00 | 678,200.00 |
| Stanley A. Bass | 172.6 | 125 | 21,575.00 | 43,150.00 |
| Joel Berger | 78.75 | 125 | 9,843.75 | 19,687.50 |
| Alvin Bronstein | 2.85 | 125 | 356.25 | 712.50 |
| Steven Winter | 371.8 | 100 | 37,180.00 | 74,360.00 |
| Samuel Biscoe | 123.0 | 100 | 12,300.00 | 24,600.00 |
| Frank Alvarez | 71.25 | 75 | 5,343.75 | 10,687.50 |
| John Jordan | 24.7 | 75 | 1,852.50 | 3,705.00 |
| Gail Saliterman | 95.95 | 75 | 7,196.25 | 14,392.50 |
| Katherine Crocker | 41.5 | 75 | 3,120.00 | 6,240.00 |
| Stephen B. Yoken | 34.9 | 75 | 2,617.50 | 5,235.00 |
| McCutcheon, Doyle, et al. | 676.2 | 45 | 30,429.00 | 60,858.00 |

**25.** The hours used in this calculation are based on the hours summarized in Exhibit T of the Declaration of William Bennett Turner, which, in turn, was based on the sworn statements and time records of the individual attorneys. As set forth in this order, the hours claimed by plaintiffs' attorneys have been reduced by 5%, to account for the possibility of overlap in time spent by the various attorneys involved. *See* Section VI, (1), *supra.*

**26.** The base award is based on multiplication of the hours spent by the hourly rate. The total award represents this product, multiplied by two, as set forth in the order.

| ATTORNEY | HOURS | RATE | BASE AWARD | TOTAL AWARD |
|---|---|---|---|---|
| Paralegals | 89.4 | $ 25 | $ 2,235.00 | $ 4,470.00 |
| Law Clerks | 272.1 | 25 | 6,802.50 | 13,605.00 |
| TOTALS | 7,788.7 | | $831,341.50 | $1,662,683.00 |

### TABLE II

| ATTORNEY | DISBURSEMENTS |
|---|---|
| William Bennett Turner | $41,862.10 |
| Steven Winter | 7,990.98 |
| McCutcheon, Doyle, et al. | 1,257.56 |
| Samuel Biscoe | 330.75 |
| Katherine Crocker | 248.55 |
| Stephen B. Yoken | 153.74 |
| Alvin Bronstein | .80 |
| TOTAL | $51,844.48 |